[Crim. No. 23151. Apr. 19, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY BURROUGHS, Defendant and Appellant.

826

**COUNSEL**

William A. Wright and Estelle A. Schleicher for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just, W. Scott Thorpe and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—Defendant Burroughs, a 77-year-old self-styled "healer," appeals from a judgment convicting him of unlawfully selling drugs, compounds, or devices for alleviation or cure of cancer (Health & Saf. Code, § 1707.1); felony practicing medicine without a license (Bus. & Prof. Code,

§ 2141.5, now § 2053); and second degree felony murder (Pen. Code, § 187) in the treatment and death of Lee Swatsenbarg.

■ Burroughs challenges his second degree murder conviction by contending the felonious unlicensed practice of medicine is not an "inherently dangerous" felony, as that term has been used in our previous decisions to describe and limit the kinds of offenses which will support application of the felony-murder rule. We conclude that while the felonious unlicensed practice of medicine can, in many circumstances, pose a threat to the health of the individual being treated, commission of that crime as defined by statute does not inevitably pose danger to human life. Under well-established principles it cannot, therefore, be made the predicate for a finding of murder, absent proof of malice. As a consequence, we must reverse defendant's second degree felony-murder conviction.

The trial court did properly instruct the jury with respect to the unlawful selling of drugs, compounds, or devices for alleviation or cure of cancer, and felony practicing medicine without a license. There was substantial evidence presented from which the jury could have convicted defendant of these crimes. We affirm these convictions.

Lee Swatsenbarg had been diagnosed by the family physician as suffering from terminal leukemia. Unable to accept impending death, the 24-year-old Swatsenbarg unsuccessfully sought treatment from a variety of traditional medical sources. He and his wife then began to participate in Bible study, hoping that through faith Lee might be cured. Finally, on the advice of a mutual acquaintance who had heard of defendant's ostensible successes in healing others, Lee turned to defendant for treatment.

During the first meeting between Lee and defendant, the latter described his method of curing cancer. This method included consumption of a unique "lemonade," exposure to colored lights, and a brand of vigorous massage administered by defendant. Defendant remarked that he had successfully treated "thousands" of people, including a number of physicians. He suggested the Swatsenbargs purchase a copy of his book, *Healing for the Age of Enlightenment.* If after reading the book Lee wished to begin defendant's unorthodox treatment, defendant would commence caring for Lee immediately. During the 30 days designated for the treatment, Lee would have to avoid contact with his physician.

Lee read the book, submitted to the conditions delineated by defendant, and placed himself under defendant's care. Defendant instructed Lee to drink the lemonade, salt water, and herb tea, but consume nothing more for the ensuing 30 days. At defendant's behest, the Swatsenbargs bought a lamp

equipped with some colored plastic sheets, to bathe Lee in various tints of light. Defendant also agreed to massage Lee from time to time, for an additional fee per session.

Rather than improve, within two weeks Lee's condition began rapidly to deteriorate. He developed a fever, and was growing progressively weaker. Defendant counseled Lee that all was proceeding according to plan, and convinced the young man to postpone a bone marrow test urged by his doctor.

During the next week Lee became increasingly ill. He was experiencing severe pain in several areas, including his abdomen, and vomiting frequently. Defendant administered "deep" abdominal massages on two successive days, each time telling Lee he would soon recuperate.

Lee did not recover as defendant expected, however, and the patient began to suffer from convulsions and excruciating pain. He vomited with increasing frequency. Despite defendant's constant attempts at reassurance, the Swatsenbargs began to panic when Lee convulsed for a third time after the latest abdominal massage. Three and a half weeks into the treatment, the couple spent the night at defendant's house, where Lee died of a massive hemorrhage of the mesentary in the abdomen. The evidence presented at trial strongly suggested the hemorrhage was the direct result of the massages performed by defendant.

## I.

Defendant's conviction of second degree felony murder arose out of the jury's determination that Lee Swatsenbarg's death was a homicide committed by defendant while he was engaged in the felonious unlicensed practice of medicine. The trial court ruled that an underlying felony of unlicensed practice of medicine could support a felony-murder conviction because such practice was a felony "inherently dangerous to human life."[1] Consequently, the trial judge instructed the jury that if the homicide resulted directly from

---

[1] Felony practicing medicine without a license violates section 2053 of the Business and Professions Code (formerly § 2141.5) which states: "Any person who willfully, under circumstances or conditions which cause or create a risk of great bodily harm, serious physical or mental illness, or death, practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked or suspended certificate as provided in this chapter, or without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is punishable by imprisonment in the county jail for not exceeding one year or in the state prison."

the commission of this felony, the homicide was felony murder of the second degree.[2] This instruction was erroneous as a matter of law.

■ When an individual causes the death of another in furtherance of the perpetration of a felony, the resulting offense may be felony murder. (*People* v. *Doyell* (1874) 48 Cal. 85.) This court has long held the felony-murder rule in disfavor. "We have repeatedly stated that felony murder is a 'highly artificial concept' which 'deserves no extension beyond its required application.'" (*People* v. *Dillon* (1983) 34 Cal.3d 441, 462-463 [194 Cal.Rptr. 390, 668 P.2d 697], quoting *People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; accord, *People* v. *Henderson* (1977) 19 Cal.3d 86, 92-93 [137 Cal.Rptr. 1, 560 P.2d 1180], and authorities cited there.) ■ For the reasons stated below, we hold that to apply the felony-murder rule to the facts of the instant case would be an unwarranted extension of this highly "anachronistic"[3] notion.

At the outset we must determine whether the underlying felony is "inherently dangerous to human life." (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) We formulated this standard because "[i]f the felony is not inherently dangerous, it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony." (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 4 [47 Cal.Rptr. 7, 406, P.2d 647].)

■ In assessing whether the felony is inherently dangerous to human life, "we look to the elements of the felony in the abstract, not the particular

---

[2]Second degree felony murder was defined for the jury as, "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of practicing medicine without a license under circumstances or conditions which cause or create risk of great bodily harm, serious mental or physical illness, or death, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree. [¶] The specific intent to commit such felony, i.e., practicing medicine without a license under circumstances or conditions which cause or create risk of great bodily harm, serious mental or physical illness, or death, and the commission of or attempt to commit such crime must be proved beyond any doubt." (CALJIC No. 8.32.)

[3]*People* v. *Phillips, supra,* 64 Cal.2d 574, 583, footnote 6. "The felony-murder doctrine has been censured not only because it artificially imposes malice as to one crime because of defendant's commission of another but because it anachronistically resurrects from a bygone age a 'barbaric' concept that has been discarded in the place of its origin." (*Ibid.*)

In *People* v. *Dillon, supra,* 34 Cal.3d 441, 462-472, we reaffirmed the first degree felony-murder rule despite serious reservations as to its rationality and moral vitality, because we regarded ourselves bound by the explicit statutory provision (Pen. Code, § 189) from which that rule derived. The second degree felony-murder rule, by contrast, is a creature of judicial invention, and as the Chief Justice's concurring opinion suggests the time may be ripe to reconsider its continued vitality. We decline to do so here, however, since that issue has not been raised, briefed, or argued.

'facts' of the case.'' (*Id.*, at p. 458, fn. 5; *People* v. *Phillips, supra,* 64 Cal.2d 574, 582; *People* v. *Henderson, supra,* 19 Cal.3d 86, 93; *People* v. *Satchell* (1971) 6 Cal.3d 28, 36-38, 39-42 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Lopez* (1971) 6 Cal.3d 45, 51-52 [98 Cal.Rptr. 44, 489 P.2d 1372].) This form of analysis is compelled because there is a killing in every case where the rule might potentially be applied. If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous. We continue to resist such unjustifiable bootstrapping.

In our application of the second degree felony-murder analysis we are guided by the bipartite standard articulated by this court in *People* v. *Henderson, supra,* 19 Cal.3d 86. In *Henderson,* we stated a reviewing court should look first to the primary element of the offense at issue, then to the "factors elevating the offense to a felony," to determine whether the felony, taken in the abstract, is inherently dangerous to human life (*id.,* at p. 94), or whether it possibly could be committed without creating such peril. (*Ibid.*; accord, *People* v. *Lopez, supra,* 6 Cal.3d 45.) In this examination we are required to view the statutory definition of the offense as a whole, taking into account even nonhazardous ways of violating the provisions of the law which do not necessarily pose a threat to human life. (*People* v. *Satchell, supra,* 6 Cal.3d at p. 40.)

The primary element of the offense in question here is the practice of medicine without a license. The statute defines such practice as "treating the sick or afflicted." One can certainly conceive of treatment of the sick or afflicted which has quite innocuous results—the affliction at stake could be a common cold, or a sprained finger, and the form of treatment an admonition to rest in bed and drink fluids or the application of ice to mild swelling. Thus, we do not find inherent dangerousness at this stage of our investigation.

The next level of analysis takes us to consideration of the factors which elevate the unlicensed practice of medicine to a felony: "circumstances or conditions which cause or create a risk of great bodily harm, serious mental or physical illness, *or death.*" That the Legislature referred to "death" as a separate risk, and in the disjunctive, strongly suggests the Legislature perceived that one may violate the proscription against the felonious practice of medicine without a license and yet not necessarily endanger human life.

Our analysis of the other two categories of risk delineated in Business and Professions Code section 2053 further supports this conclusion.

"Great bodily harm" is not defined in section 2053, but the closely analogous term "serious bodily injury" is defined in Penal Code section 243—which establishes appropriate punishments for the crime of battery when committed under various circumstances—as "[a] serious impairment of physical condition, including, but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." Pursuant to this definition, a broken arm or leg would constitute serious bodily injury—and by implication, great bodily harm as well. While painful and debilitating, such bone fractures clearly do not, by their nature, jeopardize the life of the victim.

In addition, we acknowledge that " '[s]erious bodily injury' and 'great bodily injury' are essentially equivalent elements." (*People* v. *Corning* (1983) 146 Cal.App.3d 83, 90-91 [194 Cal.Rptr. 27], citing *People* v. *Kent* (1979) 96 Cal.App.3d 130, 136-137 [158 Cal.Rptr. 35].) The term "great bodily injury," defined for purposes of enhancement in Penal Code section 12022.7 as "significant or substantial physical injury," has been held to include a broken jaw (*People* v. *Johnson* (1980) 104 Cal.App.3d 598, 609 [164 Cal.Rptr. 69]) and a broken hand (*People* v. *Kent, supra*). Obviously these injuries do not rise to the level of being inherently life-threatening.

There is no indication the Legislature intended to ascribe a different meaning to "great bodily harm," as that term is used in section 2053, than is signified by "great bodily injury," or, for that matter, "serious bodily injury," in the Penal Code sections we have discussed. Thus, we must conclude that the risk of great bodily harm under section 2053 is likewise not inherently dangerous to human life.

The statute at issue can also be violated by administering to an individual in a manner which threatens risk of serious mental or physical illness. Whether risk of serious physical illness is inherently dangerous to life is a question we do not reach; however, we believe the existence of the category of risk of serious mental illness also renders a breach of the statute's prohibitions potentially less than inherently dangerous to life.

As with the term "great bodily harm," "mental illness" is not defined in section 2053. We have found no case in which a court of this state has made an attempt at such definition in the context of an adjudication pursuant to that statutory provision. Based on the meaning of "mental illness" in other contexts under California law, however, we are convinced this term encom-

passes a range of conditions, some of which are not inherently threatening to human life.

Under Civil Code section 232, subdivision (a)(6) (relating to proceedings to terminate parental custody under circumstances where a child's "parents are, and will remain incapable of supporting or controlling the child . . . because of mental deficiency or . . . illness"), mentally ill persons have been judicially defined as people " '(a) [w]ho are of such mental condition that they are in need of supervision, treatment, care, or restraint' " or " '(b) [w]ho are of such mental condition that they are dangerous to themselves or to the person or property of others.' " (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 490 [146 Cal.Rptr. 623, 579 P.2d 514], citing *In re Baby Boy T.* (1970) 9 Cal.App.3d 815, 820 [88 Cal.Rptr. 418].) This judicial definition tracks the language of former Welfare and Institutions Code section 5550, which defined mental illness for purposes of treatment of the mentally ill.

While conceding these definitions contemplate the possibility that mental illness may be inherently dangerous, we note they suggest there are occasions when this need not be the case. It is not difficult, for example, to envision one who suffers from delusions of grandeur, believing himself to be the President of the United States. An individual who purports without the proper license to be able to treat such a person need not be placing the patient's life in jeopardy, though such treatment, if conducted, for example, without expertise, may lead to the need for more serious psychiatric attention.

Consequently, we are disinclined to rule today that the risks set forth in section 2053 are so critical as to render commission of this felony of necessity inherently dangerous to human life. Indeed, were we to interpret either the risk of great bodily harm or serious mental illness as being synonymous with the risk of death for purposes of the felony-murder rule, we would be according those terms a more restrictive meaning than that which the Legislature obviously meant them to have in the definition of the felony itself. Such a reading would require that an unlicensed practitioner of medicine actually perform treatment under circumstances or conditions which necessarily place the very life of the patient in jeopardy before such a practitioner could be susceptible to a conviction for *felonious* unlicensed practice. We possess grave doubts that the Legislature intended such a result.

Moreover, our analysis of precedent in this area reveals that the few times we have found an underlying felony inherently dangerous (so that it would support a conviction of felony murder), the offense has been tinged with malevolence totally absent from the facts of this case. In *People* v. *Mattison*

(1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193], we held that poisoning food, drink, or medicine with intent to injure was inherently dangerous. The wilful and malicious burning of an automobile (located in a garage beneath an occupied home) was ruled inherently dangerous in *People v. Nichols* (1970) 3 Cal.3d 150, 162-163 [89 Cal.Rptr. 721, 474 P.2d 673]. Finally, we held kidnaping to be such an offense in *People v. Ford, supra,* 60 Cal.2d 772, 795, overruled on other grounds in *People v. Satchell, supra,* 6 Cal.3d 28, 35-41.

To hold, as we do today, that a violation of section 2053 is not inherently so dangerous that by its very nature, it cannot be committed without creating a substantial risk that someone will be killed, is consistent with our previous decisions in which the underlying felony has been held not inherently hazardous. We have so held where the underlying felony was felony false imprisonment (*People v. Henderson, supra,* 19 Cal.3d 86), possession of a concealable firearm by an ex-felon (*People v. Satchell, supra,* 6 Cal.3d 28), escape from a city or county penal facility (*People v. Lopez, supra,* 6 Cal.3d 45), and in other, less potentially threatening circumstances.[4]

Finally, the underlying purpose of the felony-murder rule, to encourage felons to commit their offenses without perpetrating unnecessary violence which might result in a homicide, would not be served by applying the rule to the facts of this case. Defendant was or should have been aware he was committing a crime by treating Swatsenbarg in the first place.[5] Yet, it is unlikely he would have been deterred from administering to Lee in the manner in which he did for fear of a prosecution for murder, given his published beliefs on the efficacy of massage in the curing of cancer. Indeed, nowhere is it claimed that defendant attempted to perform any action with respect to Swatsenbarg other than to heal him—and earn a fee for doing so.

This clearly is a case in which conviction of felony murder is contrary to our settled law, as well as inappropriate as a matter of sound judicial policy. The instruction regarding felony murder was erroneous.

Accordingly, defendant's second degree murder conviction is reversed.

## II.

In addition to asserting the felonious unlicensed practice of medicine will not provide the predicate for a felony-murder conviction because felonious

---

[4]Including where the underlying felonies were grand theft by false pretenses (*People v. Phillips, supra,* 64 Cal.2d 574); and conspiracy to possess methedrine illegally (*People v. Williams, supra,* 63 Cal.2d 452).

[5]He had been convicted of practicing medicine without a license in 1960.

unlicensed medical practice is not inherently dangerous to human life, Burroughs claims the trial court erroneously refused to give an instruction, requested by defendant, on the purportedly lesser included offense of involuntary manslaughter. Our conclusion the felony of practicing medicine without a license is not inherently dangerous, of course, obviates the necessity of reaching this alternative basis for purposes of reversal. ▮▮ To provide guidance to the trial court should Burroughs be retried for the death of Lee Swatsenbarg, however, we now consider whether, on the facts alleged, Burroughs could properly be charged and convicted of involuntary manslaughter. We will conclude that while there was no evidence to suggest Swatsenbarg's demise was the intended consequence of Burroughs' treatment of the decedent, there was substantial evidence that this treatment, the administering of "deep abdominal massages" in particular, was performed "without due caution and circumspection," and was the proximate cause of Lee Swatsenbarg's death. Thus, on the evidence presented, Burroughs was susceptible to a possible conviction of involuntary manslaughter,[6] and the jury should have been so instructed. (See, e.g., *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84].)

Manslaughter is defined in Penal Code section 192 as "the unlawful killing of a human being without malice."[7] Manslaughter can be either voluntary or involuntary. Involuntary manslaughter is "the unlawful killing of a human being in certain unlawful ways without any intention of doing so." (*People* v. *McManis* (1954) 122 Cal.App.2d 891, 898 [266 P.2d 134].) There is no allegation made, nor was there any evidence adduced at trial, that Burroughs at any time harbored any intent even to harm Swatsenbarg in the slightest fashion.[8] The evidence was very substantial, however, that Lee Swatsenbarg's death resulted directly from the abdominal massages administered by defendant Burroughs. Swatsenbarg died from massive hemorrhaging in the abdominal mysentary, soon after Burroughs boasted of how "deep" into the abdomen of the decedent his massages had gotten. There was substantial testimony from medical experts that leukemia victims such as Swatsenbarg are significantly more susceptible to hemorrhaging than are

---

[6]By so ruling we do not mean to prejudice defendant should he be retried, only that on the evidence presented at trial, a jury could reasonably have convicted defendant of involuntary manslaughter.

[7]"[M]alice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned or malignant heart." (Pen. Code, § 188.)

[8]Thus, while Burroughs may be criminally responsible for the death of Lee Swatsenbarg, he is not subject to a conviction for voluntary manslaughter—"a wilful act, characterized by the presence of an intent to kill . . . ." (*People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 413 [303 P.2d 1018]; *People* v. *Forbs* (1965) 62 Cal.2d 847, 852 [44 Cal.Rptr. 753, 402 P.2d 825].)

individuals who do not suffer from the disease. This testimony also included the conclusion that many portions of a leukemia victim's body are extremely sensitive if subjected to physical contact—and that the bleeding in Swatsenbarg's abdominal region was the result of severe trauma to that area. No other likely sources of this degree of trauma were suggested at trial. Assuming the jury found the cause of death to be the "therapy" administered to Swatsenbarg by Burroughs, defendant committed a homicide without malice, which falls explicitly under the rubric of manslaughter as defined in section 192.

Involuntary manslaughter is described in section 192 as a killing, without malice "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." While a killing in the course of commission of a noninherently dangerous felony does not appear to be precisely within one of these descriptions, the court in *People* v. *Morales* (1975) 49 Cal.App.3d 134, 144 [122 Cal.Rptr. 157], held that as a matter of statutory construction, the noninherently dangerous felony of grand theft may support a conviction of involuntary manslaughter, if the felony is committed "without due caution and circumspection." We agree that the only logically permissible construction of section 192 is that an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection. Thus, if the jury had concluded the activities performed by Burroughs in the course of the commission of the felonious unlicensed practice of medicine proximately caused the death of Lee Swatsenbarg, and that these activities were committed "without due caution and circumspection,"[9] the jury could properly have convicted Burroughs of involuntary manslaughter.

Indeed, while the descriptions listed in section 192 of the ways in which involuntary manslaughter is committed do not specifically detail circumstances identical to those involved in this case, the only rational interpretation of section 192 is that the Legislature intended felons

---

[9]"Due caution and circumspection" within the meaning of section 192 is equivalent to criminal negligence, which is conduct that is "'such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or indifference to consequences.'" (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926].) In the instant case there was substantial testimony that a reasonably prudent physician would have known that administering "deep abdominal massage" to a leukemia victim such as Swatsenbarg would render the likelihood of hemorrhage very high. Burroughs' treatment of Swatsenbarg, given defendant's apparent indifference to, or lack of awareness of this common medical knowledge, is at the core of activity performed "without due caution and circumspection."

situated as Burroughs is here be susceptible to conviction for involuntary manslaughter.[10] "It would be anomalous to hold, although defendant's unlawful act proximately caused the death, that he should bear no criminal responsibility for the homicide." (*People* v. *Morales, supra,* 49 Cal.App.3d at p. 144.) More anomalous still would be a holding that while one who kills in the course of a *lawful* act without due caution and circumspection is guilty of involuntary manslaughter, one such as Burroughs, who allegedly commits a homicide while committing a noninherently dangerous *felony,* is guilty only, perhaps, of a battery. If Swatsenbarg died from the massages unlawfully administered by Burroughs, defendant certainly ought not *benefit* from the fact that those massages were felonious, rather than lawful.

"[T]he basic definition set forth at the outset of Penal Code section 192 is of controlling significance—'Manslaughter is the unlawful killing of a human being, without malice.'" (*Id.,* at p. 145.) The Legislature provided in section 192, subdivision 2, that a killing in the commission of a lawful act which might produce death if committed without due caution and circumspection is involuntary manslaughter. ▮ ▮ ▮ ▮ A fortiori, an unintentional homicide committed in the course of a noninherently dangerous felony (which might, nevertheless, produce death if committed without due caution and circumspection) ought be punishable under section 192 as well.[11]

Thus, while Burroughs' second degree felony-murder conviction must be reversed, if the decision again be made to prosecute him he is susceptible to a charge and possible conviction of involuntary manslaughter.

Mosk, J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

**BIRD, C. J.,** Concurring.—The majority reverse appellant's second degree felony-murder conviction on the ground that practicing medicine without a license is not an inherently dangerous felony. I agree with that conclusion, as well as with the directions that on retrial appellant may be prosecuted for involuntary manslaughter. However, I would rest the reversal on a broader ground. The time has come for this court to discard the artificial and court-created offense of second degree felony murder.

---

[10]It is a well settled rule of statutory construction that if possible, legislation is to be interpreted to lead to rational, rather than absurd outcomes. (*Jersey Maid Milk Products* v. *Brock* (1939) 13 Cal.2d 620 [91 P.2d 577].)

[11]The mere conclusion that a homicide was the proximate result of a felony, absent a showing that defendant acted "without due caution and circumspection" is, however, insufficient to support an involuntary manslaughter conviction. For example, a person who steals a woman's unattended purse while the "victim" stands across the street is not criminally responsible for the death of the woman resulting from her tripping and suffering a severe fall in pursuit of the thief.

As Justice Mosk noted for the court in *People* v. *Dillon* (1983) 34 Cal.3d 441, 462 [194 Cal.Rptr. 390, 668 P.2d 697], this court "hold[s] no brief for the felony-murder rule." Felony murder has been described as "a highly artificial concept that deserves no extension beyond its required application." (*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353], fn. omitted.) "[T]he rule is much censured 'because it anachronistically resurrects from a bygone age a "barbaric" concept that has been discarded in the place of its origin' . . . and because 'in almost all cases in which it is applied it is unnecessary' and 'it erodes the relation between criminal liability and moral culpability' . . . ." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 463 (lead opn. of Mosk, J.), quoting *People* v. *Phillips, supra,* 64 Cal.2d at p. 583, fn. 6 and *People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130]; maj. opn., *ante,* at p. 829.)

This court is responsible for the legal doctrines which it creates. (*People* v. *Drew* (1978) 22 Cal.3d 333, 347 [149 Cal.Rptr. 275, 583 P.2d 1318].) The second degree felony-murder rule is, "as it has been since 1872, a judge-made doctrine without any express basis in the Penal Code (see *People* v. *Phillips* (1966) *supra,* 64 Cal.2d 574, 582, and cases cited." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 472, fn. 19 (lead opn. of Mosk, J.); accord *People* v. *Wilson* (1969) 1 Cal.3d 431, 441 [82 Cal.Rptr. 494, 462 P.2d 22].[1]) Therefore, the power to do away "with . . . the 'barbaric' anachronism which we are responsible for creating" lies with this court. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 494 (conc. opn. of Bird, C. J.).) Such long overdue judicial surgery would not intrude upon the prerogatives of the other two branches of government. (Cf. *People* v. *Dillon, id.,* at p. 463 (lead opn. of Mosk, J.).)

Accordingly, this court should take the long-overdue step and eliminate the second degree felony-murder rule.[2]

---

[1]Although the *Dillon* court did not do so, I would disapprove any suggestion to the contrary in *People* v. *Taylor* (1980) 112 Cal.App.3d 348, 356-357 [169 Cal.Rptr. 290].

[2]This court would not be the first to take such a step. In *People* v. *Aaron* (1980) 409 Mich. 672 [299 N.W.2d 304, 113 A.L.R.4th 1180], the Michigan Supreme Court, interpreting a statute similar to Penal Code section 189, concluded after an exhaustive and scholarly analysis that the statute did not codify the common law felony-murder rule but merely elevated any murder otherwise proven to murder of the first degree when committed during the perpetration of one of the named felonies. This interpretive step was not a radical one. Several other state courts had so interpreted similar statutes. The Michigan court went further, however. It reviewed the *common law* doctrine of felony murder and concluded that "it violates the basic premise of individual moral culpability upon which our criminal law is based." (299 N.W.2d at p. 328.) As a result, the court abolished the felony-murder rule in Michigan.

In *Dillon,* a majority of the court declined to follow the *Aaron* court's lead with respect to the first degree felony-murder rule since the rule had been codified by the Legislature.

## I.

Many writers and commentators[3] have concluded that the common law doctrine of felony murder is of questionable origin. (*People* v. *Aaron, supra,* 299 N.W.2d at p. 307; see also, e.g., Kaye, *The Early History of Murder and Manslaughter, Part II* (1967) 83 Law Q. Rev. 569, 593 (hereafter *Kaye*); *Recent Developments, Criminal Law: Felony-Murder Rule—Felon's Responsibility for Death of Accomplice* (1965) 65 Colum.L.Rev. 1496, fn. 2 (hereafter *Recent Developments*).) In an attempt to understand the development of the doctrine and the numerous restrictions and limitations which have been imposed by both courts and legislatures, it is necessary to briefly review the common law concept of homicide and its relationship to the felony-murder rule.

At early common law, all homicides were criminal[4] without regard to the mental state of the actor. (Moreland, The Law of Homicide (1952) at pp. 1-4; Sayre, *Mens Rea* (1932) 45 Harv.L.Rev. 974, 977-981 (hereafter *Sayre*); Robinson, *A Brief History of Distinctions in Criminal Culpability* (1980) 31 Hastings L.J. 815, 823.) As with every other felony,[5] homicide was punishable by death.[6] (Perkins & Boyce, Criminal Law, *supra,* p. 14; Seibold, *The Felony-Murder Rule: In Search of a Viable Doctrine* (1978) 23 Cath.Law. 133, fn. 1 (hereafter *Seibold*).)

The law soon recognized the need to distinguish between intentional and accidental killings. By the 13th century, it was clear that an accidental killing or killing "by misadventure," while not subject to acquittal, would entitle the person convicted to a royal pardon. (Perkins, *A Re-examination of Malice Aforethought* (1934) 43 Yale L.J. 537, 539-540 (hereafter *Malice Aforethought*); *Sayre, op. cit. supra,* 45 Harv.L.Rev. at p. 980; see also

---

Thus, "[h]owever much [the court] agree[d] with the reasoning of *Aaron,* [it could not] duplicate its solution to the problem . . . ." (34 Cal.3d at p. 463.) However, no statutory bar appears with respect to the second degree felony-murder rule so this court may in that context follow the lead of the Michigan Supreme Court.

[3]The author owes a great debt to the late Justice Mathew O. Tobriner for his work in this area. He more than anyone is responsible for any clarity this opinion may bring to this intractable area of the law.

[4]The law at this point recognized no distinction between a crime and a tort. Liability for a homicide included both punishment of the offender and payment to the surviving relatives of the deceased.

[5]The common law concept of a felony is, of course, considerably different from the felony as it appears in modern statutory codes. At common law, the term was limited to a few very serious crimes, nearly all involving assaultive conduct or the danger of physical harm. (See Perkins & Boyce, Criminal Law (1982) pp. 14-15.)

[6]There *is* some evidence to believe that while the punishment of death was theoretically possible in the case of all felonies, it was far from uniformly applied, varying principally with the seriousness of the offense. (See 2 Pollack & Maitland, The History of English Law (2d ed. 1909) p. 488.)

*McGautha* v. *California* (1971) 402 U.S. 183, 197 [28 L.Ed.2d 711, 720, 91 S.Ct. 1454].)

The influence of the Church and canon law also resulted in the addition of certain distinctions to the law of homicide. Ecclesiastic courts had always retained jurisdiction to try clerics accused of felonies. Because the Church refused to impose capital punishment, submission of a case to Church jurisdiction resulted in leniency of the most important sort. (See Note, *Felony Murder as a First Degree Offense: An Anachronism Retained* (1957) 66 Yale L.J. 427, 429 (hereafter *Anachronism Retained*).) "Benefit of clergy," as this practice was known, thus became a means of mitigating the harshness of the common law's meat-axe approach to all homicides, regardless of mental state. The punishment for those felons eligible for benefit of clergy was limited to the branding of a thumb and one year's imprisonment. (*Sayre, op. cit. supra,* 45 Harv.L.Rev. at pp. 996-997.) Focusing on the character of the offender rather than the nature of the offense, the practice was gradually expanded by the use of a presumption that any person who could read and write was a cleric, and thus ineligible for the death penalty.[7] (*Anachronism Retained, op. cit. supra,* 66 Yale L.J. at p. 429.)

As a greater proportion of the society became literate, the injustice of the system became apparent. Moreover, the principle of benefit of clergy conflicted with the fundamental philosophy of canon law, which had always emphasized the importance of subjective moral blameworthiness in assessing the degree of criminal culpability. These factors led to a series of statutes in the 15th and 16th centuries which abolished the benefit of clergy for certain of the more culpable homicides. (*Sayre, op. cit. supra,* 45 Harv.L.Rev. at p. 996; *Anachronism Retained, op. cit. supra,* 66 Yale L.J. at pp. 429-430, fn. 19.) These more culpable homicides, denominated murder,[8] were distinguished as having been committed with "malice aforethought" or "malice prepensed." All other homicides, for which benefit of clergy was still available, developed into the crime of manslaughter. (*Malice Aforethought, op. cit. supra,* 43 Yale L.J. at pp. 543-544.)

---

[7]Medieval England was, perhaps, more candid than 20th century America. Compare *Furman* v. *Georgia* (1972) 408 U.S. 238, 365-366 [33 L.Ed.2d 346, 422, 92 S.Ct. 2726] (conc. opn. of Marshall, J.): "It also is evident that the burden of capital punishment falls upon the poor, the ignorant, and the underprivileged members of society."

[8]"Murder" derives from the term *murdrum* which originally referred to a heavy amercement which was levied against an English village whenever a Norman lord was killed in an ambush. By the mid-14th century, there were no longer any foreign-born Normans left in England and the requirement for an amercement was statutorily abolished. *Murdrum,* however, remained a part of the language as a way of referring to the most serious kind of homicide. (See 2 Pollack & Maitland, The History of English Law, *op. cit. supra,* at pp. 486-488; *Sayre, op. cit. supra,* 45 Harv.L.Rev. at p. 995.)

It is within this framework that the felony-murder rule was born. The exact origins of the rule, however, are far from clear. The most oft-cited early statement of the rule appears in Lord Coke's Third Institute (6th ed. 1680) page 56. (See 2 Torcia, Wharton's Criminal Law (14th ed. 1979) p. 204; 3 Stephen, History of the Criminal Law of England (1883) p. 57.) Coke did not propose a rationale but rather illustrated by example:

"If the act be unlawful it is murder. As if A. meaning to steal a deer in the park of B., shooteth at the deer, and by the glance of the arrow killeth a boy that is hidden in a bush: this is murder, for that the act was unlawful, although A. had no intent to hurt the boy, nor knew not of him. But if B. the owner of the park had shot at his own deer, and without any ill intent had killed the boy by the glance of his arrow, this had been homicide by misadventure, and no felony.

"So, if one shoot at any wild fowle upon a tree, and the arrow killeth any reasonable creature afar off, without any evill intent in him, this is *per infortunium* [misadventure]: for it was not unlawful to shoot at the wilde fowle: but if he had shot at a cock or hen, or any tame fowle of another mans, and the arrow by mischance had killed a man, this had been murder, for the act was unlawfull." This statement of the rule was refined by Hale and Foster, who limited the murder designation to any killing in the course of a felony. (1 Hale, Pleas of the Crown (1847) pp. 465, 475; Foster, Crown Cases (2d ed. 1791) pp. 258-259; see *Malice Aforethought, op. cit. supra,* 43 Yale L.J. at p. 559; see also Moreland, The Law of Homicide, *supra,* p. 42, fn. 6.)

The basis for Lord Coke's statement, which went unquestioned for several hundred years, appears dubious. Two 16th century English cases have been suggested as support, but courts and commentators have concluded that each was, in reality, based on an entirely different proposition.[9] Professors Mo-

---

[9]In *People* v. *Aaron, supra,* 299 N.W.2d at pages 307-308, the Michigan Supreme Court discussed these two cases as follows:

"The first formal statement of the doctrine is often said to be *Lord Dacres'* case, Moore 86; 72 Eng.Rep. 458 (KB, 1535). Lord Dacres and some companions agreed to enter a park without permission to hunt, an unlawful act, *and to kill anyone who might resist them.* While Lord Dacres was a quarter of a mile away, one member of his group killed a gamekeeper who confronted him in the park. Although Lord Dacres was not present when the killing occurred, he, along with the rest of his companions, was convicted of murder and was hanged. Contrary to the construction placed on this case by those who see it as a source of the felony-murder rule, the holding was not that Lord Dacres and his companions were guilty of murder because they had joined in an unlawful hunt in the course of which a person was killed, but rather that those not present physically at the killing were held liable as principals on the theory of constructive presence. Moreover, because they had agreed previously to kill anyone who might resist them, all the members of the group shared in the *mens rea* of the crime. Thus, because *Lord Dacres'* case involved express malice, no doc-

reland and Perkins, in their respective treatises, analyze in a historical sense the genesis of the rule, but neither theory provides much support for the rationality of the doctrine.[10]

Regardless of whether Coke's statement may properly be termed the first formal expression of the felony-murder rule, it nonetheless has served as the focal point of analysis and criticism of the doctrine. As has been noted, Hale and Foster saw fit to substantially limit Coke's version of the rule by confining its application to felonies, rather than to all unlawful acts. Writing in the 17th century, Hobbes commented that the rule "is not distinguished

---

trine finding malice from the intention to commit an unlawful act was necessary or in fact utilized.

"Another early case which has been cited for the origin of the felony-murder doctrine was decided after *Lord Dacres'* case. In *Mansell & Herbert's* case, 2 Dyer 128b; 73 Eng.Rep. 279 (KB, 1558), Herbert and a group of more than 40 followers had gone to Sir Richard Mansfield's house 'with force to seize goods under pretence of lawful authority.' One of Herbert's servants threw a stone at a person in the gateway which instead hit and killed an unarmed woman coming out of Mansfield's house. The question was agreed to be whether the accused were guilty of murder or manslaughter. Since misadventure was not considered, it can be assumed that the throwing of the stone was not a careless act but that the servant who threw the stone intended at least to hit, if not kill, some person on Mansfield's side. Although the court divided, the majority held that if one deliberately performed an act of violence to third parties, and a person not intended died, it was murder regardless of any mistake or misapplication of force. The minority would have held it to be manslaughter because the violent act was not directed against the woman who died. Thus, *Herbert's* case involved a *deliberate act of violence* against a person, which resulted in an unintended person being the recipient of the violent act." (Fns. omitted, italics in original. See also *Kaye, op. cit. supra*, 83 Law Q. Rev. at pp. 578-579, 592-593; *Anachronism Retained, op. cit. supra*, 66 Yale L.J. at pp. 430-431, fn. 23; *Recent Developments, op. cit. supra*, 65 Colum.L.Rev. at p. 1496, fn. 2.)

[10]Quoting again from *People* v. *Aaron, supra*, 299 N.W.2d at page 309, footnote 24: ". . . Moreland sees the felony-murder rule as an extension of the doctrine of malice aforethought. For this proposition he cites Lambard, who states:

" ' "And therefore if a thief do kill a man whom he never saw before and whom he intended to rob only, it is murder in the judgment of law, which implyeth a former malicious disposition in him rather to kill the man than not to have his money from him." ' " 3 Stephen[, *op. cit.*] *supra*, pp. 50-51. Moreland observes that this was an attempt to justify the rule as an inference of fact in order to satisfy the definition of malice aforethought prevailing at that time. But, in Moreland's opinion, it does not carry conviction as such. Moreland, Law of Homicide (Indianapolis: Bobbs-Merrill, 1952), p. 14.

"Stephen, commenting on the above passage from Lambard, states:

" 'The law can hardly be justified in "presupposing" that a thief "carryeth that malicious mind that he will achieve his purpose though it be with the death of him against whom it is directed," from the fact that he trips a man up in order to rob him and happens to kill him.' 3 Stephen . . . *supra*, p. 51.

"Perkins contends that the primary purpose of the felony-murder rule was to deal with homicides committed during unsuccessful attempted felonies. An attempt to commit a felony was only a misdemeanor at common law. The felony-murder rule placed the defendant in the position he would have been in had the felony been successful without the homicide, for in either case it would be a capital crime. Perkins, Criminal Law (2d ed.) p. 44." (See also Note, *Imputing Act and Intent in Felony Murder Cases: An Elaborate Fiction* (1966) 40 Conn. Bar. J. 107, 108: "[S]ince a felony could be resisted to the point of killing the felon, the law presumed that a felon had the intent to kill if necessary to protect his life.")

by any statute but is the *common law* only of Sir Edward Coke." (6 Hobbes, English Works (Molesworth ed. 1840) *Dialogue of the Common Laws,* pp. 86-87, quoted in Arent & MacDonald, *The Felony Murder Doctrine and Its Application Under the New York Statutes* (1935) 20 Cornell L.Q. 288, 289, italics in original.)

In 1883, Judge Sir James Fitzjames Stephen embarked on an extensive criticism of Coke's conclusion. Stephen termed the felony-murder rule "astonishing" and "monstrous." (3 Stephen, *op. cit. supra,* at pp. 57, 65, 75.) He further stated that the Coke passage is "entirely unwarranted by the authorities which he quotes." (*Id.,* at p. 57.) Modern writers have reached the similar conclusion that Coke's "creation" of the felony-murder rule was totally without legal or rational foundation.[11]

## II.

The history of the felony-murder rule is in reality a history of limitation. The path of limitation, as well as the result, has differed depending on the jurisdiction.

As early as 1834, an English governmental commission described the felony-murder rule as being "totally incongruous with the general principles of our jurisprudence." (First Rep. of His Majesty's Commissioners on Crim. Law (1834) at p. 29, quoted in *Recent Developments, op. cit. supra,* 65 Colum.L.Rev. at p. 1496.) The statement merely made explicit what was an ongoing process in English common law to limit application of the felony-murder doctrine.

A series of cases in the 19th century[12] culminating with *Regina* v. *Serne* (1887) 16 Cox Crim. Cas. 311 virtually abolished the common law felony-murder rule in England. In *Serne,* Judge Stephen, whose pointed criticism of Coke was noted earlier, stated the law as follows: "[I]nstead of saying that any act done with intent to commit a felony and which causes death

---

[11]See *Recent Developments, op. cit. supra,* 65 Colum.L.Rev. at page 1496, footnote 2: "A telling historical comment on the essential non-logic of the rule is made by those who see its genesis as a blunder by Coke in the translation and interpretation of a passage from Bracton." The passage from Bracton referred to suggests only that a killing which results from an unlawful act is also unlawful, not that such a killing is *murder.* (2 Bracton, De Legibus et Consuetudinibus Angliae (Thorne ed. 1968) p. 341; see also *People* v. *Aaron, supra,* 299 N.W.2d at p. 310.) In addition, the example of an unlawful act used by Bracton (throwing a stone toward a commonly used walkway) arguably suggests what would today be considered equivalent to a reckless state of mind independently sufficient to establish the actual malice necessary for murder. (See Wilner, *Unintentional Homicide in the Commission of an Unlawful Act* (1939) 87 U.Pa.L.Rev. 811.)

[12]See Moreland, The Law of Homicide, *supra,* at pages 42-43.

amounts to murder, it would be reasonable to say that any act known to be dangerous to life, and likely in itself to cause death done for the purpose of committing a felony which caused death, should be murder." (*Id.*, at p. 313.)

Stephen's characterization of the law strongly suggests that a reckless mens rea is required to prove murder. The actor must *know* that his act is "likely in itself to cause death." Professor Perkins concluded that Stephen was "inclined to require for murder . . . the same degree of wanton and wilful disregard for human life which would constitute malice aforethought if no felony were being attempted."[13] (*Malice Aforethought, op. cit. supra,* 43 Yale L.J. at p. 559, fn. omitted.)

Yet Judge Stephen's enlightened view was not long-lived. A series of cases beginning in 1898[14] and culminating with the House of Lords decision in *Director of Public Prosecutions* v. *Beard* (1920) App.Cas. 479 re-established the felony-murder rule, albeit with some restrictions.[15] Notwithstanding its renewed existence, the rule was rarely invoked in the 20th century. It was applied, if at all, in cases in which there was ample independent evidence that the defendant possessed at least a reckless mental state. (*Prevezer, op. cit. supra,* (1957) 57 Colum.L.Rev. at p. 635, see fn. 10 *ante.*)

The death knell for the felony-murder rule in England was sounded by the Homicide Act of 1957. Section 1 of the act provided in relevant part: "Where a person kills another in the course or furtherance of some other offence, the killing shall not amount to murder unless done with the same malice aforethought (express or implied) as is required for a killing to amount to murder when not done in the course or furtherance of another offense." (See *Prevezer, op. cit. supra,* 57 Colum.L.Rev. at pp. 633-636.) Thus by statute, Parliament vindicated the view expressed by Judge Stephen

---

[13]See CALJIC No. 8.31 (4th ed. 1982 pocket pt.) page 64:

"Murder of the second degree is [also] the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being." (Compare Model Pen. Code (Proposed Official Draft 1962) § 2.02, subd. (2)(c), p. 26.)

[14]See generally Moreland, The Law of Homicide, *supra*, at page 45 and cases cited therein.

[15]In *Beard*, the defendant was charged with murder when he accidentally suffocated his rape victim while trying to quiet her screams. The House of Lords held that if the defendant, in the course of a violent felony, commits a violent act which results in death, he is guilty of murder regardless of how unintended the resulting death was. The attempt to quiet the girl's screams was held in *Beard* to be a sufficiently violent act. (See Moreland, The Law of Homicide, *supra*, at pp. 46-47; Prevezer, *The English Homicide Act: A New Attempt to Revise the Law of Murder* (1957) 57 Colum.L.Rev. 624, 634 (hereafter *Prevezer*).)

some 60 years earlier that a killing in the course of a felony is not murder unless the essential element of malice is independently proved.[16]

In the United States, the rule has followed a somewhat similar path. Since the state of English common law in 1776 served as the basis for the development of American jurisprudence, Blackstone's version of the felony-murder rule[17] became an integral part of the common law of the first 13 states. Not surprisingly, the Atlantic separation did nothing to reduce the amount of criticism to which the doctrine has been subjected. As early as 1854, this criticism appears to have resulted in the statutory abolition of the felony-murder rule in Ohio. (*Robbins* v. *State* (1857) 8 Ohio St. 131, 188-190; see also *Commonwealth* ex rel. *Smith* v. *Myers* (Pa. 1970) 261 A.2d 550, 554; Model Pen. Code, § 201.2, com. 4 (Tent. Draft No. 9, 1959) p. 35.)

Oliver Wendell Holmes questioned the rule's deterrent effect in 1881. "[I]f a man does an act with intent to commit a felony, and thereby accidentally kills another, . . . [t]he fact that the shooting is felonious does not make it any more likely to kill people. If the object of the rule is to prevent such accidents, it should make accidental killing with firearms murder, not accidental killing in the effort to steal; while, if its object is to prevent stealing, it would do better to hang one thief in every thousand by lot." (Holmes, The Common Law (1881) pp. 57-58.)

Two states, Hawaii and Kentucky, have followed Ohio in abolishing the felony-murder rule by statute. (Hawaii Rev. Stat., § 707-701 (1976); Ky. Rev. Stat., § 507.020 (1975).) The comment to the Hawaii statute is instructive.

"Even in its limited formulation the felony-murder rule is still objectionable. It is not sound principle to convert an accidental, negligent, or reckless homicide into a murder simply because, without more, the killing was in

---

[16]Criticism of the felony-murder rule and the concept of presumed or constructive malice appears in virtually every country whose legal system, based on the tradition of English common law, is "blessed" with this relic of our medieval heritage. (See, e.g., Burns & Reid, *From Felony Murder to Accomplice Felony Attempted Murder: The Rake's Progress Compleat?* (1977) 55 Canadian Bar Rev. 74, 104-105; Westling, *Manslaughter By Unlawful Act: The "Constructive" Crime Which Serves No Constructive Purpose* (1974) 7 Sydney L.Rev. 211, 223.) India abolished the felony-murder rule by statute in 1951. (See Model Pen. Code, § 201.2, com. 4 (Tent. Draft No. 9, 1959) p. 36.) None of the nations of continental Europe has a concept of criminal law analogous to the felony-murder rule. (*Ibid.*)

[17]"[W]hen an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter according to the nature of the act which occasioned it. If it be in prosecution of a felonious intent, or in it's [*sic*] consequences naturally tended to bloodshed, it will be murder; but if no more was intended than a mere civil trespass, it will only amount to manslaughter." (4 Blackstone's Commentaries (Tucker ed. 1803) 192-193, fn. omitted.)

furtherance of a criminal objective of some defined class. Engaging in certain penally-prohibited behavior may, of course, evidence a recklessness sufficient to establish manslaughter, or a practical certainty or intent, with respect to causing death, sufficient to establish murder, but such a finding is an independent determination which must rest on the facts of each case. . . .

" . . . . . . . . . . . . . . . . . . . . .

"In recognition of the trend toward, and the substantial body of criticism supporting, the abolition of the felony-murder rule, and because of the extremely questionable results which the rule has worked in other jurisdictions, the Code has eliminated from our law the felony-murder rule." (Hawaii Rev. Stat., § 707-701 (1976) commentary, p. 347.)

The drafters of the Model Penal Code concluded that the felony-murder rule should be abandoned. (Model Pen. Code, § 201.2, com. 4 (Tent. Draft No. 9, 1959) p. 33; Wechsler, *Codification of Criminal Law in the United States: The Model Penal Code* (1968) 68 Colum.L.Rev. 1425, 1446.) However, concern over possible political opposition to the idea led them to insert a provision in section 201.2(b)'s definition of reckless murder, to the effect that "recklessness and [extreme] indifference [to the value of human life] are [rebuttably] presumed if the actor is engaged or is an accomplice in the commission of, or an attempt to commit or flight after committing or attempting to commit [one of seven enumerated felonies]." (*Ibid.*, see now Model Pen. Code, § 210.2, subd. (1)(b) (Official Draft 1962) p. 13; Wechsler, *op. cit. supra,* 68 Colum.L.Rev. at pp. 1446-1447.)

While New Hampshire is the only state to have adopted the Model Penal Code formulation,[18] several other states require that the accused exhibit a mens rea above and beyond the mere intent to commit a felony. Arkansas requires that the defendant cause death "under circumstances manifesting extreme indifference to the value of human life." (Ark. Stat. Ann., § 41.1502; compare CALJIC No. 8.31, cited at fn. 13 *ante.*) The Texas Penal Code provides that the act causing death must be "clearly dangerous to human life." (Tex. Pen. Code Ann., § 19.02(a)(3) (Vernon 1974).) The Delaware first degree murder statute mandates that the accused at least have acted with criminal negligence in the course of committing certain enumerated felonies or recklessly in the course of committing nonenumerated felonies. (Del. Code, tit. 11, § 636(a)(2), (6) (1979).)

---

[18]If the presumption of recklessness and extreme indifference is not rebutted, the defendant is guilty of second degree murder. (N.H. Rev. Stat. Ann., § 630:1-b(I)(b) (1974).)

Numerous other states have passed legislation modifying the rule or restricting its application. In at least six states, a conviction based on a felony-murder theory can only be punished as second degree murder.[19] Wisconsin treats felony murder as a class B felony,[20] while Maine distinguishes it from any other degree of murder.[21]

Perhaps the most objectionable and often criticized feature of the felony-murder rule involves its vicarious application to accomplices who did not participate in the acts which caused the victim's death. (See *Seibold, op. cit. supra,* 23 Cath.Law. at pp. 152-153.) Accordingly, legislatures in 10 states have adopted statutes which provide an affirmative defense for such persons in certain limited circumstances.[22]

While some state legislatures have been active in modifying the felony-murder rule, most of the limitations on the doctrine have been imposed by the courts as part of their role in the continuing development of the common law.[23] In 1959 the drafters of the Model Penal Code listed seven major

---

[19](Alaska: Alaska Stat., § 11.41.110(a)(3) (1980); Louisiana: La. Rev. Stat. Ann., § 14:30.1(2) (West's Supp. 1981); New York: N.Y. Pen. L., § 125.25(3) (McKinney 1975); Pennsylvania: Pa. Cons. Stat. Ann., tit. 18., § 2502(b) (Purdon Supp. 1980-81); Utah: Utah Code Ann., § 76-5-203(1) (1978).) Minnesota classifies a nonsex offense-related felony murder as murder in the second degree. (Minn. Stat. Ann., §§ 609.185, 609.19 (West's 1964).) For an excellent overview of the relationship of the felony-murder rule to statutory criminal law in American jurisdictions, see Alderstein, *Felony-Murder in the New Criminal Codes* (1975-1976) 4 Am.J.Crim. Law 249.

[20]Wisconsin requires that the killing be a "natural and probable consequence of the commission or attempt to commit a felony." (Wis. Stat. Ann., § 940.02(2) (West's 1982).) A class B felony in Wisconsin is punishable by a term of imprisonment not to exceed 20 years. (§ 939.50(3)(b).)

[21]Felony murder in Maine can result in a maximum imprisonment of 20 years. (Me. Rev. Stat. Ann., tit. 17A, §§ 202, 1252(2)(A). See generally Rubin, *Commentaries on the Maine Criminal Code—Homicide* (1976) 28 Maine L.Rev. 57, 58.)

[22]The New York statute (N.Y. Pen. L., § 125.25(3)) is typical: ". . . [I]n any prosecution under this subdivision, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

"(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

"(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

"(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

"(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury." (See also Alaska Stat., § 11.41.115(b) (1980); Ark. Stat. Ann., §§ 41-1501(2), 41-1502(2) (1977); Colo. Rev. Stat., § 18-3-102(2) (1978); Conn. Gen. Stat. Ann., § 53a-54c (West's Supp. 1981); Me. Rev. Stat., tit. 17A, § 202 (West's 1983); N.J. Stat. Ann., § 2C:11-3(a)(3) (West's 1982); N.D. Cent. Code, § 12.1-16-01(3) (Supp. 1983); Ore. Rev. Stat., § 163.115(3) (1975); Wash. Rev. Code Ann., § 9A.32.030 (1977).)

[23]It was on this basis that the *Aaron* court abolished the common law felony-murder rule in Michigan.

limitations which had been imposed by various state courts.[24] The intervening 25 years have done little to reduce the need for or number of limitations on the rule. The most important of these include requirements that the underlying felony be inherently dangerous (*Wade* v. *State* (Okl. Crim.App. 1978) 581 P.2d 914; *Commonwealth* v. *Bowden* (1973) 456 Pa. 278 [309 A.2d 714] (conc. opn. of Nix, J.); see also Annot. (1973) 50 A.L.R.3d 397);[25] that the killing be committed by one of the felons (*State* v. *Canola* (1977) 73 N.J. 206 [374 A.2d 20]; *Commonwealth* ex rel. *Smith* v. *Myers, supra,* 261 A.2d 550; *Commonwealth* v. *Balliro* (1965) 349 Mass. 505 [209 N.E.2d 308, 14 A.L.R.3d 640]; see also Annot. (1974) 56 A.L.R.3d 239); that the duration of the felony be strictly construed (e.g., *People* v. *Smith* (1974) 55 Mich.App. 184 [222 N.W.2d 172, 175]; *State* v. *Golladay* (1970) 78 Wn.2d 121 [470 P.2d 191, 197-198]; *People* v. *Jackson* (1967) 20 N.Y.2d 440 [285 N.Y.Supp.2d 8, 231 N.E.2d 722, 732]; see also Annot. (1974) 58 A.L.R.3d 851); and that the purpose of the underlying felony be independent of the killing. (E.g., *Garrett* v. *State* (Tex.Crim.App. 1978) 573 S.W.2d 543; *State* v. *Branch* (1966) 244 Ore. 97 [415 P.2d 766]; see also Annot. (1971) 40 A.L.R.3d 1341.)

California's approach to the rule mirrors these developments. This court has consistently reiterated that the " 'highly artificial concept' . . . of strict

---

[24]See Model Penal Code section 201.2, comment 4 (Tent. Draft No. 9, 1959) at page 37:

"Some American courts have responded to the plea for limitation by imposing one or more of the following requirements:

"(1) The felonious act must be dangerous to life. See, *e.g., People* v. *Pavlic,* 227 Mich. 562, 199 N.W. 373 (1924); *State* v. *Diebold,* 152 Wash. 68, 277 Pac. 394, 395-396 (1929); *cf. People* v. *Goldvarg,* 346 Ill. 398, 1978 N.E. 892 (1931).

"(2) The homicide must be a natural and probable consequence of the felonious act. See, *e.g., Power* v. *Commonwealth,* 110 Ky. 386, 61 S.W. 735 (1901).

"(3) Death must be 'proximately' caused. See, *e.g., Burton* v. *State,* 122 Tex. Cr. 363, 55 S.W.2d 813 (1933).

"(4) The felony must be *malum in se.* See, *e.g., People* v. *Pavlic, supra.*

"(5) The act must be a common law felony. See, *e.g., Commonwealth* v. *Exler,* 243 Pa. 155, 89 Atl. 968 (1914); *State* v. *Burrell,* 120 N.J.L. 277, 199 Atl. 18 (1938).

"(6) The period during which the felony is in the process of commission must be narrowly construed. See, *e.g., State* v. *Diebold,* 152 Wash. 68, 277 Pac. 394 (1929); *People* v. *Smith,* 232 N.Y. 239, 133 N.E. 574 (1921); *Huggins* v. *State,* 149 Miss. 280, 115 So. 213 (1928); *State* v. *Taylor,* 173 La. 1010, 139 So. 463 (1931); *People* v. *Marwig,* 227 N.Y. 382, 125 N.E. 535 (1919).

"(7) The underlying felony must be 'independent' of the homicide. *People* v. *Moran,* 246 N.Y. 100, 158 N.E. 35 (1927); *People* v. *Huter,* 184 N.Y. 237, 77 N.E. 6 (1906); *State* v. *Fisher,* 120 Kan. 226, 243 Pac. 291 (1926); *State* v. *Severns,* 158 Kan. 453, 148 P.2d 488 (1941); *State* v. *Shock,* 68 Mo. 552 (1878)."

[25]One of the earliest expressions of this limitation appears in *Powers* v. *Commonwealth* (1901) 110 Ky. 386 [61 S.W. 735, 742]: "Under our statute the removal of a corner stone is punishable by a short term in the penitentiary, and is therefore a felony. If, in attempting this offense, death were to result to one conspirator by his fellows accidentally dropping the stone upon him, no Christian court would hesitate to apply this ['inherently dangerous'] limitation."

criminal liability" (*People* v. *Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]) embodied in the felony-murder rule "'should not be extended beyond any rational function that it is designed to serve.'" (*People* v. *Smith* (1984) *ante,* p. 803 [201 Cal.Rptr. 311, 678 P.2d 886], quoting *People* v. *Washington, supra,* 62 Cal.2d at p. 783.) Accordingly, in deciding whether to apply the rule in various factual settings, this court has "sought to insure that the . . . doctrine be given the narrowest possible application consistent with its ostensible purpose—which is to deter those engaged in felonies from killing negligently or accidentally . . . ." (*People* v. *Satchell, supra,* 6 Cal.3d at p. 34, citations omitted.)

The reasons for limiting the rule were well summarized over a decade ago in *People* v. *Satchell, supra,* 6 Cal.3d 28. This court observed that the felony-murder rule is "usually unnecessary for conviction . . . ." (*Id.,* at p. 33.) In almost all cases in which the rule is applied, conviction "'can be predicated on the normal rules as to murder and as to accomplice liability. . . . [¶] 'If the defendant commits the felony in a highly reckless manner, he can be convicted of second degree murder independently of the shortcut of the felony-murder rule. Under California's interpretation of the implied malice provision of the Penal Code [§ 188], proof of conduct evidencing extreme or wanton recklessness establishes the element of malice aforethought required for a second degree murder conviction. . . . [In cases where the facts suggested such a theory], the prosecutions would be free to prove the extreme recklessness of the conduct. The jury would decide whether the evidence, including the defendant's conduct and inferences rising from it, established the requisite malice aforethought . . . .'" (*Id.,* at pp. 33-34, fn. 11, quoting Packer, *The Case for Revision of the Penal Code* (1961) 13 Stan.L.Rev. 252, 259, and Note (1967) 55 Cal.L.Rev. 329, 340.) In the "small residuum" of cases where the "normal rules" of murder would not apply, "'there may be a substantial question whether the rule reaches a rational result or does not at least distract attention from more relevant criteria.'" (*Ibid.,* quoting Packer, *op. cit. supra.*)

In keeping with this view of the rule, the limitations on its application have been extensive. This court has "refused to apply the doctrine in cases wherein the killing is committed by persons other than the defendant or an accomplice acting in furtherance of a common felonious design . . . ; in cases wherein the operation of the doctrine depends upon 'a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged' . . . ; and in cases wherein the underlying felony is not one of the six enumerated in section 189 of the Penal Code and is not inherently dan-

gerous to human life . . . ." (*People* v. *Satchell, supra,* 6 Cal.3d at p. 34, citations omitted.)[26]

As to this last limitation, " '[i]f the felony is not inherently dangerous, it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony.' " (Maj. opn., *ante,* at p. 829, quoting *People* v. *Williams* (1965) 63 Cal.2d 452, 457-458, fn. 4 [47 Cal.Rptr. 7, 406 P.2d 647].) Thus, California courts have identified several felonies which are not inherently dangerous to human life and have on that basis prohibited conviction on second degree felony-murder principles. (Maj. opn., *ante,* at pp. 831-833 [practicing medicine without a license]; *People* v. *Henderson* (1977) 19 Cal.3d 86, 93-95 [137 Cal.Rptr. 1, 560 P.2d 1180] [false imprisonment]; *People* v. *Satchell, supra,* 6 Cal.3d at pp. 35-41 [possession of a concealable firearm by an ex-felon], 41-43 [possession of a sawed-off shotgun]; *People* v. *Lopez* (1971) 6 Cal.3d 45, 50-52 [98 Cal.Rptr. 44, 489 P.2d 1372] [escape from a city or county penal facility]; *People* v. *Phillips, supra,* 64 Cal.2d at pp. 582-583 [grand theft by false pretenses]; *People* v. *Williams, supra,* 63 Cal.2d at p. 458 [conspiracy to possess methedrine without a prescription]; *People* v. *Morales* (1975) 49 Cal.App.3d 134, 141-143 [122 Cal.Rptr. 157] [grand theft person]; *People* v. *Lovato* (1968) 258 Cal.App.2d 290, 293-296 [65 Cal.Rptr. 638], disapproved on other grounds in *People* v. *Satchell, supra,* 6 Cal.3d at p. 39 [possession of concealable weapon by an alien]; see also *People* v. *Houts* (1978) 86 Cal.App.3d 1012, 1018 [150 Cal.Rptr. 589] [sodomy].)[27]

---

[26]The Courts of Appeal have also found ways in which to limit the harsh application of the rule.

Consider *People* v. *Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321]. There, the court reversed a second degree felony-murder conviction where the underlying felony, manslaughter of the accused's wife, furnished the basis for the second degree felony-murder conviction of an unborn fetus carried by the wife. The court found it "unnecessary to resort to the felony-murder rule where the homicide of two persons by the same act constitutes separate offenses for which separate prosecutions and conviction may be had independent of the short cut of the felony-murder rule." (*Id.,* at p. 354.) Such a finding was compelled by the conclusion "that a man assaulting two persons at the same time and by the same act would not be deterred by the felony-murder rule since the assault was an integral part of the resulting homicide of the two victims." (*Ibid.*)

[27]On the other hand, certain felonies have been found to be inherently dangerous to human life. (*People* v. *Mattison* (1971) 4 Cal.3d 177, 184 [93 Cal.Rptr. 185, 481 P.2d 193] [poisoning food, drink, or medicine with intent to injure]; *People* v. *Nichols* (1970) 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d] [wilful and malicious burning of a motor vehicle]; *People* v. *Kelso* (1976) 64 Cal.App.3d 538, 541 [134 Cal.Rptr. 364]; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 989 [121 Cal.Rptr. 684] [simple kidnaping]; *People* v. *Calzada* (1970) 13 Cal.App.3d 603, 605 [91 Cal.Rptr. 912] [driving a vehicle under the influence of narcotics]; *People* v. *Taylor* (1970) 11 Cal.App.3d 57, 59 [89 Cal.Rptr. 697]; *People* v. *Cline* (1969) 270 Cal.App.2d 328, 333 [75 Cal.Rptr. 459, 32 A.L.R.3d 582] [furnishing or administering dangerous drugs]; *Brooks* v. *Superior Court* (1966) 239 Cal.App.2d 538, 541 [48 Cal.Rptr. 762] [forcibly preventing a police officer from performing his duty].) In these

Even today's majority recognize that appellant would most likely not have been deterred by the possibility that his actions could have subjected him to a murder conviction, since his "published beliefs on the efficacy of massage in the curing of cancer" (maj. opn., *ante,* at p. 833) were firmly entrenched and for well over two decades formed the basis for his "medical practice."

As the list of limitations and modifications grows longer, the California second degree felony-murder rule bears less and less resemblance to Blackstone's simple statement that "when an involuntary killing happens . . . in prosecution of a felonious intent . . . it will be murder." (4 Blackstone's Commentaries, *supra,* at pp. 192-193; see fn. 17, *ante.*) As the *Aaron* court noted, "[t]o the extent that these modifications reduce the scope and significance of the common-law doctrine, they also call into question the continued existence of the doctrine itself." (299 N.W.2d at p. 316.) In sum—and particularly in light of the fact that this court has sole responsibility for the creation of the rule—the viability of it is a question that can no longer be ignored.

## III.

The second degree felony-murder rule erodes the important relationship between criminal liability and an accused's mental state. That relationship has been described as "the most basic principle of the criminal law."[28] (Gegan, *Criminal Homicide in the Revised New York Penal Law* (1966) 12 N.Y.L. Forum 565, 586; see also *Sayre, op. cit. supra,* 45 Harv.L.Rev. 974; Perkins, *Some Weak Points in the Model Penal Code* (1965) 17 Hastings L.J. 3, 12-14.) "It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." (*Morissette v. United States* (1952) 342 U.S. 246, 250 [96 L.Ed. 288, 293, 72 S.Ct. 240], fn. omitted.)

The second degree felony-murder rule, as a strict liability concept, violates this most important principle.[29] (See *People v. Henderson, supra,* 19 Cal.3d at pp. 92-93.) Not only does it obliterate the distinction between

---

few cases, as today's majority observe, the felony at issue "has been tinged with malevolence . . . ." (Maj. opn., *ante,* at p. 833.)

[28] Our modern-day notion of mens rea as an essential criminal element is derived from Blackstone's concept of a "vicious will": "[A]n unwarrantable act without a vi[c]ious will is no crime at all." (4 Blackstone's Commentaries (Tucker ed. 1803) 21.)

[29] Mr. Justice Marshall has criticized the felony-murder rule on this ground: "Whether a death results in the course of a felony (thus giving rise to felony-murder liability) turns on fortuitous events that do not distinguish the intention or moral culpability of the defendants." (*Lockett v. Ohio* (1978) 438 U.S. 586, 620 [57 L.Ed.2d 973, 999, 98 S.Ct. 2954] (conc. opn.).)

intended and unintended homicides, but it seeks to apply the same ponderous sanction to any participant in the criminal conspiracy or enterprise from which a death results. Thus, the doctrine has been applied where a codefendant served only in a getaway driver capacity (see, e.g., *People* v. *Hill* (1967) 66 Cal.2d 536, 558 [58 Cal.Rptr. 340, 426 P.2d 908] [first degree felony murder]), where the codefendant was present at the scene of the killing but did not fire the fatal shot (see, e.g., *People* v. *Kelso, supra,* 64 Cal.App.3d at pp. 541-542; *People* v. *Lynn* (1971) 16 Cal.App.3d 259, 264, 272 [94 Cal.Rptr. 16]), and where the victim died from a heart attack precipitated by the fright induced by commission of the felony. (*People* v. *Stamp* (1969) 2 Cal.App.3d 203, 208-211 [82 Cal.Rptr. 598] [first degree felony murder].)

Legal commentators have been virtually unanimous in their condemnation of the felony-murder rule because it ignores the significance of the actor's mental state in determining his criminal liability. As the drafters of the Model Penal Code concluded in 1959, "principled argument in . . . defense [of the felony-murder rule] is hard to find." (Model Pen. Code, § 201.2, com. 4 (Tent. Draft No. 9, 1959) at p. 37; see also *Commonwealth* ex rel. *Smith* v. *Myers, supra,* 261 A.2d at pp. 553-554.)

As noted earlier, the rule is perhaps the last vestige of an archaic and indiscriminate philosophy still present in our modern system of criminal law.[30] "The rationale of the doctrine is that one who commits a felony is a bad person with a bad state of mind, and he has caused a bad result, so that we should not worry too much about the fact that the fatal result he accomplished was quite different and a good deal worse than the bad result he intended. Yet it is a general principle of criminal law that one is not ordinarily criminally liable for bad results which differ greatly from intended results." (LaFave & Scott, Criminal Law (1972) p. 560.) Thus, it is difficult to take issue with one commentator's conclusion that "the felony-murder rule, as a hold-over from the days of our barbarian Anglo-Saxon ancestors . . . , has very little right to existence in modern society." (Mueller, *Criminal Law and Administration* (1959) 34 N.Y.U.L.Rev. 83, 98, fn. omitted.)

Of course, recognition of the irrationality of the felony-murder doctrine is not novel. This court's pronouncements on the disfavored status that the rule holds in California jurisprudence are numerous. (See, e.g., *People* v.

---

[30]As Professor Hall has noted, "[t]he underlying rationale of the felony-murder doctrine— that the offender has shown himself to be a 'bad actor,' and that this is enough to exclude the niceties bearing on the gravity of the harm actually committed—might have been defensible in early law. The survival of the felony-murder doctrine is a tribute to the tenacity of legal conceptions rooted in simple moral attitudes." (Hall, General Principles of Criminal Law (1947) p. 455, quoted in *People* v. *Aaron, supra,* 299 N.W.2d at p. 318.)

*Henderson, supra,* 19 Cal.3d at p. 92.) Indeed, this court's decisions over the past 20 years may probably best be characterized as an attempt to avoid rather than to apply the rule. (See *ante,* pp. 848-850.) Given the court's repeated conclusion that application of the second degree felony-murder rule is not mandated by any California statute, a decision to abrogate that rule would be merely a natural extension of our prior holdings.

This court could, of course, leave the decision of whether to apply the second degree felony-murder rule in a given instance to the trier of fact. It is well established that the jury has the power to disregard the law and/or the facts in returning a verdict which is contrary to the evidence, as long as such verdict does not prejudice the accused. (See *People* v. *Dillon, supra,* 34 Cal.3d at pp. 490-493 (conc. opn. of Kaus, J.); *Horning* v. *District of Columbia* (1920) 254 U.S. 135, 138-139 [65 L.Ed. 185, 186-187, 41 S.Ct. 53]; *People* v. *Powell* (1949) 34 Cal.2d 196, 205 [208 P.2d 974]; *People* v. *Gottman* (1976) 64 Cal.App.3d 775, 780-781 [134 Cal.Rptr. 834]; see also *United States* v. *Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1138-1144 (dis. opn. of Bazelon, J.).)

However, the harshness of the rule, which leads some juries to disregard the law and others to follow it only with great reluctance, results in haphazard application of the criminal sanction. (See Ludwig, *Foreseeable Death in Felony Murder* (1956) 18 U.Pitt.L.Rev. 51, 62.) As the Ohio Supreme Court concluded more than a century ago in deciding to abandon the felony-murder rule, "crime is more effectually prevented by the *certainty* than by any unreasonable *severity* of punishment disproportionate to the turpitude and danger of the offense." (*Robbins* v. *State, supra,* 8 Ohio St. at p. 170, italics in original.) In my view, it is far preferable to do away with an irrational doctrine than to permit it to be applied in an irrational manner.

## IV.

The abrogation of the common law second degree felony-murder rule would not change the result in the majority of homicide cases. (Cf. *People* v. *Aaron, supra,* 299 N.W.2d at p. 327.) In cases other than first degree felony murders, malice would remain the essential distinguishing element of murder. (Pen. Code, § 187; see *People* v. *Dillon, supra,* 34 Cal.3d at pp. 475-477, and fns. 23 & 24.) As in the past, malice would be established in one of two ways: (1) when the accused "manifest[s] a deliberate intention unlawfully to take away the life of a fellow creature" (Pen. Code, § 188), or (2) when he (a) commits an act which is likely to cause death, and (b) consciously and unjustifiably disregards the substantial probability that death will result. (*People* v. *Washington, supra,* 62 Cal.2d at p. 780; *People*

v. *Poddar* (1974) 10 Cal.3d 750, 759 [111 Cal.Rptr. 910, 518 P.2d 342].)
In order to establish conscious disregard in this context, the state would still
have to show that the accused understood "the duty imposed upon him not
to commit [such] acts" and that he acted despite this understanding.[31] (*Id.*,
at p. 760.)

If the trier of fact found malice by one of these two theories, section 187
would, as in the past, classify the killing as murder. In such a situation, a
killing which occurs in the course of any inherently dangerous felony not
enumerated in Penal Code section 189 would be murder in the second degree.

No longer would a killing which occurs during the commission of an
inherently dangerous felony, standing alone, constitute second degree murder. However, one should not conclude that when death ensues in such a
situation, the commission of a dangerous felony is an irrelevant factor in
determining whether or not the defendant acted with malice. To the contrary, the circumstances of the crime including the commission of the felony
may provide strong circumstantial evidence that the defendant intended to
kill the victim or that he committed an act in conscious disregard of the
substantial probability that death would result. (See Pen. Code, § 21.)

The jury would be given the opportunity to make an independent determination of each defendant's individual culpability, a determination which
would not be reversed on appeal unless unsupported by substantial evidence.
Therefore, abolishing the second degree felony-murder rule would not significantly reduce the number of murder convictions. (See *People* v. *Washington, supra,* 62 Cal.2d at p. 783; *People* v. *Aaron, supra,* 299 N.W.2d
at pp. 327-328; see also Packer, *op. cit. supra,* 13 Stan.L.Rev. at p. 259;
*Seibold, op. cit. supra,* 23 Cath.Law. at p. 135, fn. 4; Comment, *Felony
Murder in Illinois,* 1974 U.Ill.L.F. 685, 693.)

This conclusion is supported by the experience of jurisdictions which have
abolished the felony-murder rule. (See, e.g., *People* v. *Aaron, supra,* 299
N.W.2d at pp. 328-329; Model Pen. Code, § 201.2, Com. 4 (Tent. Draft
No. 9, 1959) p. 39; *Seibold, op. cit. supra,* 23 Cath.Law. at p. 159.) Additionally, even if a jury were to find that a killing was without malice, the
accused is still liable for the underlying felony as well as any lesser degree
of homicide which the evidence may support.[32]

---

[31]It should be emphasized that while an accused's act in conscious disregard of human life
need not be the immediate cause of death (see *People* v. *Reed* (1969) 270 Cal.App.2d 37
[75 Cal.Rptr. 430]), it must in itself be so likely to cause death as to render the probability
of that result substantial. (See *Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 591 [91 CR
275, 477 P2d 131] [91 Cal.Rptr. 275, 477 P.2d 131] (dis. opn. of Peters, J.).)

[32]There may well be few, if any, cases involving a killing in the course of an inherently
dangerous felony in which the evidence would not support an involuntary manslaughter
conviction based on a defendant's criminal negligence. (See Pen. Code, §§ 192 and 193.)

There will be times when a jury is convinced that the accused's mental state does not justify a murder conviction.[33] In the first degree felony-murder context, this court's powers are circumscribed because the rule is a creature of statute. However, where no statutory bar appears, this court should not mandate a murder conviction in the absence of a finding of malice. To do so violates very basic concepts of rationality and proportionality.

As Holmes so eloquently stated, "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." (Holmes, Collected Legal Papers (1920) p. 187.) It is time this court laid this ill-conceived rule to rest.

**RICHARDSON, J.**\*—I respectfully dissent. In my view, the unauthorized practice of medicine "under circumstances or conditions which cause or create a risk of great bodily harm, serious physical or mental illness, or death" (Bus. & Prof. Code, § 2053) fully supports application of the second degree felony-murder rule.

Relying on hypertechnical and irrelevant distinctions between great bodily harm, serious physical and mental injury, and the risk of death, the majority ignores the "rational function that [the felony-murder rule] is designed to serve." (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) As we have frequently reiterated, that purpose "is to deter those engaged in felonies from killing negligently or accidentally (see *People* v. *Washington, supra,* 62 Cal.2d 777, 781-783; . . .)." (*People* v. *Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361, 50

---

[33]Consider the facts in *People* v. *Dillon, supra,* 34 Cal.3d 441. Dillon was a 17-year-old student who unsuccessfully attempted to rob—and in the process fatally shot—a rural marijuana grower who was guarding his crop. (*Id.,* at pp. 451-452.) The jury convicted Dillon of first degree murder based on its finding that the killing had occurred during the course of an attempted robbery. As was clear from their communications with the trial court during and after deliberations, the jurors had serious reservations about applying the felony-murder rule. (*Id.,* at pp. 483-485 (lead opn. of Mosk, J.).)

Nevertheless, on appeal, a majority of this court was compelled by statute to uphold application of the rule. (*Id.,* at p. 463.) The court found, however, that the life sentence imposed as a result violated the cruel or unusual punishment clause of the California Constitution (art. I, § 17), and accordingly reduced the conviction to second degree murder. (*Id.,* at pp. 485-489.)

As a technique for doing justice in an individual case, the approach by the *Dillon* majority is a good one. However, where, as here, unjust results can be avoided by eliminating an irrational doctrine from this state's common law, that approach is preferred.

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

A.L.R.3d 383]; accord, *People* v. *Henderson* (1977) 19 Cal.3d 86, 93 [137 Cal.Rptr. 1, 560 P.2d 1180].)

In those cases in which we have found the felony-murder doctrine not to apply, the felony, properly viewed in the abstract, contained by definition elements which did not usually entail any risk of harm to the victim. Thus the possibility of negligent or accidental death did not flow logically from each possible element of the crime. (See *People* v. *Henderson, supra,* 19 Cal.3d 86 [false imprisonment effectuated by "violence, menace, fraud or deceit" with no distinction in the statute between violent and fraudulent or deceitful means]; *People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372] [escape, where statute encompassed both violent and non-violent escapes]; *People* v. *Satchell, supra,* 6 Cal.3d 28 [possession of a concealable firearm by a felon]; *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353] [grand theft]; *People* v. *Williams* (1965) 63 Cal.2d 452 [60 Cal.Rptr. 472, 430 P.2d 30] [conspiracy to obtain methedrine].)

In contrast, the statute at issue here explicitly *requires* a risk of actual harm or "injury" to a person. (See *People* v. *Mattison* (1971) 4 Cal.3d 177, 186 [93 Cal.Rptr. 185, 481 P.2d 193].) In *Mattison,* we considered the application of the felony-murder doctrine where the underlying felony was the wilful administration of poison "with intent that the same shall be taken by any human being *to his injury* . . . ." (Former Pen. Code, § 347, italics added.) We noted that, "Absent section 347, a defendant who administered poison to another not with conscious disregard for life, but only for the purpose of making the other mildly ill or intoxicated, could at most be found guilty only of involuntary manslaughter if an unexpected death resulted. (Pen. Code, § 192, subd. 2.) By making it a felony to administer poison with the intent to cause *any injury,* the Legislature has evidenced its concern for the dangers involved in such conduct, and the invocation of the second degree felony-murder rule in such cases when unforeseen death results serves further to deter such dangerous conduct." (P. 186, italics added.) Accordingly, we held that even though the felony was not sufficient to sustain a first degree felony-murder conviction because there was no requirement of a "conscious disregard for life," instructions on second degree felony murder were indeed appropriate. (*Ibid.*)

In so holding, we relied in part on *People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697], where the Court of Appeal upheld a second degree murder conviction under the felony-murder rule when the underlying felony

was furnishing of heroin to the victim. As we enunciated in *Mattison*, "In other words the felony was not done with the intent to commit injury which would cause death. Giving a felony-murder instruction in such a situation serves rather than subverts the purpose of the rule. 'While the felony-murder rule can hardly be much of a deterrent to a defendant who has decided to assault his victim with a deadly weapon, it seems obvious that in the situation presented in the case at bar, it does serve a rational purpose: knowledge that the death of a person to whom heroin is furnished may result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing.' (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63.)" (*People* v. *Mattison, supra,* 4 Cal.3d at p. 185.) Similarly, here, knowledge that the death of a "sick or afflicted" person whom the unauthorized practitioner treats, "willfully, under circumstances or conditions which cause or create a risk of great bodily harm, serious physical or mental illness, or death," may have an effect on such person's willingness to so practice.

The majority's fine distinctions become even more dubious when one considers the holding in *People* v. *Nichols* (1970) 3 Cal.3d 150 [89 Cal.Rptr. 721, 474 P.2d 673], approving a second degree murder conviction premised on the burning of an automobile. While we have questioned that holding to the extent that the underlying felony had not been considered in the abstract and it contained a "proscription against a variety of burnings of personal property not all of which are dangerous to human life" (*People* v. *Henderson, supra,* 19 Cal.3d at p. 96), we did not imply that if the crime of arson of a motor vehicle were contained in a separate discrete section it would not serve as a sufficient basis for invocation of the felony-murder rule. In *Nichols,* we declared that "the burning of a motor vehicle, which usually contains gasoline and which is usually found in close proximity to people, is inherently dangerous to human life. We therefore conclude that the wilful and malicious burning of a motor vehicle calls into play the second degree felony-murder rule." (3 Cal.3d at p. 163.) How can the underlying felony at issue here be less "inherently dangerous to human life" than the burning of an automobile?

In enacting Business and Professions Code section 2053, the Legislature clearly sought to impose a greater penalty in those cases where the unauthorized practice of medicine causes significant risks that may lead to death. The use of the felony-murder rule in this context clearly furthers the goal of deterring such conduct. The underlying conduct proscribed by section 2053 is manifestly "inherently dangerous to life." Viewed in the abstract, improper treatment of the "sick and afflicted" under the dangerous circum-

stances and conditions specified in that section is almost synonomous with inherently dangerous conduct.

I would affirm the judgment of conviction.

Respondent's petition for a rehearing was denied May 24, 1984. Lucas, J., was of the opinion that the petition should be granted.