Filed 7/18/16  P. v. Rangel CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE RANGEL et al.,<br><br>    Defendants and Appellants. | B258940<br><br>(Los Angeles County<br>Super. Ct. No. TA127879)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>(NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on June 27, 2016 be modified as follows:

On page 8, first paragraph of the Discussion, the sentence:  (Renteria had also been charged in connection with Sandoval's murder, but the charge was dismissed following a preliminary hearing.), is deleted so that the paragraph reads:

During trial Rangel attempted to call Art Renteria as an alibi witness. According to Rangel's counsel, Renteria told a defense investigator several months earlier that he had been with Rangel at another location at the time of the shooting.  After giving that interview, Renteria was arrested and charged with an unrelated homicide.  Renteria, represented by his counsel, appeared at Rangel's trial outside the presence of the jury.  Asked under oath about his prior interview with Rangel's investigator and what he knew about Rangel's whereabouts at the time of the shooting, Renteria invoked his Fifth Amendment privilege against self-incrimination on the advice of counsel.  The court provided all counsel with an opportunity to question Renteria further, and they declined.  The court then held

an in camera hearing with Renteria and his counsel to determine whether Renteria had a legitimate claim to self-incrimination and determined he did.  Rangel did not object to the in camera proceeding.

There is no change in judgment.  The petition for rehearing is denied.

_____
PERLUSS, P. J.                    SEGAL, J.                    BLUMENFELD, J.*

*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B258940 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA127879) |
| v. | |
| JOSE RANGEL et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed as modified.

Robert D Bacon, under appointment by the Court of Appeal, for Defendant and Appellant Jose Rangel.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Hernandez.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant Enrique Hernandez.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a joint trial Jose Rangel and Jesus Hernandez were convicted of first degree murder by one jury, and Enrique Hernandez was convicted by a separate jury of second degree murder. Both juries found true specially alleged firearm use and criminal street gang enhancements. On appeal Rangel contends the trial court deprived him of his constitutional right to present a defense when it permitted Rangel's only alibi witness to invoke his constitutional privilege against self-incrimination and refuse to testify; Jesus[1] asserts the trial court prejudicially erred in excluding under Evidence Code section 352 portions of Rangel's confession that bolstered Jesus's defense; and Enrique argues improper jury instructions and the court's failure to instruct on the lesser included offense of involuntary manslaughter constituted reversible error. Enrique also insists the evidence is insufficient to support his murder conviction and the jury's true findings on the gang enhancement. We modify the judgment to accurately reflect the court's oral pronouncements at sentencing and, as modified, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

An information charged Rangel, Jesus and Enrique with murder (Pen. Code, § 187).[2] It specially alleged each of them, or a principal, had personally used and intentionally discharged a firearm causing death (§ 12022.53, subds. (b), (c), (d), (e)(1)). In addition, the information specially alleged the murder was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)).[3] Rangel, Jesus and Enrique pleaded not guilty and denied the special allegations.

---

[1] Because brothers Jesus Hernandez and Enrique Hernandez share the same surname, we refer to them by their first names to avoid confusion.

[2] Statutory references are to this code unless otherwise indicated.

[3] For simplicity on occasion this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that, in the statutory language, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

2. *The Shooting*

According to the evidence presented to both juries at trial, Rangel, also known by his gang moniker "Lazy," and Jesus, also known by his moniker "Demon," were members of Unos Sin Verguenza (USV), a criminal street gang. On April 11, 2013 two members of the East Side Paramount (ESP) gang, a rival of USV, beat up then 18-year-old Jesus as he walked home from Paramount High School with his girlfriend. Jesus suffered a nosebleed in the attack. Later that day Jesus sent a text message to his friend, 18-year-old Rangel, telling him about the fight. Rangel responded that he was "hunting those cheese puffs right now." Cheese puffs is a derogatory term for ESP gang members. Jesus texted Rangel, "don't trip . . . . I got them tomorrow." Rangel replied in his text message, "Say no mo."

The next afternoon Rangel texted Jesus at 1:20 p.m. to tell him he was one block away from Paramount High School in ESP territory. He stated, "it's hot," meaning law enforcement was in the area, and "I got the thing with me," meaning Rangel had a gun. Jesus replied in his text message, "I'll be out right now."

Enrique, Jesus's older brother and a USV gang member known as "Evol," picked up Jesus and Rangel; and the three men drove to ESP territory looking for ESP gang members. They spotted Jonathan Sandoval crossing the street near Downey Avenue and Monroe Street. Sandoval, known as "Frosty," was an ESP gang member, though not one of Jesus's assailants from the previous day. Enrique stopped the car, and Rangel jumped out with his arm outstretched pointing his gun at Sandoval. He quickly fired four to five gunshots at Sandoval, killing him. Rangel immediately got back into the car, and the three men sped away. A witness saw the shooting and followed Enrique's car for a short while, but stopped the chase after nearly colliding with another car.

A short time after the shooting, Jesus met his brother Ricardo's 15-year-old friend, Braiant Mejia, at Mejia's house and told Mejia, "We just smoked someone," which Mejia understood meant they had killed someone. Jesus gave Mejia a gun wrapped in a shirt or fabric and asked him to hide it his house. Mejia put the gun in a toolbox on the shelf in his garage. Before leaving Mejia's house, Jesus borrowed Mejia's cell phone and made

3

three calls, one of which was to Enrique. Mejia heard Jesus tell Enrique, "Relax. It's all good. We're okay." He also overheard Enrique telling Jesus, "We're not good. Someone saw us."

3. *The Recorded Custodial Interviews with Rangel and Enrique*

a. Rangel's interview

Rangel did not testify. His custodial interview with police was played for his and Jesus's jury only. (Jesus had expressly agreed prior to trial to waive his constitutional objections to admitting Rangel's statement at his trial despite being unable to confront and cross-examine him, believing the statement assisted Jesus's defense that Rangel had acted on his own.) In that interview Rangel admitted he was a USV gang member and offered three different versions of events the day of the shooting: First, he told police he had spent the day at work and returned home in the afternoon to be with his girlfriend. Then, when he learned Jesus and Enrique had spoken to police, he added new information. While at home with his girlfriend, Jesus and Enrique called and asked him to go with them to a marijuana dispensary. He agreed. When they picked him up, Jesus showed him a gun. Rangel touched the gun and then gave it back to Jesus. After obtaining marijuana at the dispensary, the three men drove toward Downey in ESP territory. Suddenly Jesus pointed out a man he said had jumped him the previous day and demanded that Enrique pull the car over. Then, to Rangel's surprise, Jesus jumped out, shot Sandoval and jumped back in the car. Rangel was worried. He had a daughter. He did not want to be involved in this incident.

Rangel changed his story again after police suggested people had identified him as the shooter. Rangel admitted he had shot and killed Sandoval, but now claimed he had done so under duress, after an USV leader, a "shot-caller" known as "Big Man" or "Big Homie," had demanded he kill an ESP member to pay off a $15,000 drug debt he owed the gang. He explained that, when Jesus and Enrique had picked him up from his house, Jesus handed him the gun and told him, "You know what we're going to do?" Rangel understood Jesus was acting on behalf of the USV shot-caller, and the three of them were going to go search for ESP gang members. When Rangel saw Sandoval, he did not want,

4

or intend, to kill him. He took the gun Jesus had provided and shot Sandoval without really looking directly at him, hoping that he would miss. Rangel understood that he had to follow the shot-caller's orders or the gang would kill him and/or his family members. When they returned to Jesus's house, Rangel wrapped the gun in his shirt and gave it to Jesus.

b. Enrique's custodial interview

Enrique did not testify. His recorded interview with police was played for his jury only. During that interview Enrique denied he was a USV gang member but admitted he had been a member of the M2K tagging crew that associated with the USV gang. The day before the shooting Jesus had called Enrique and told him he had been jumped by three ESP gang members. Jesus's assailants had also threatened him. Concerned about his younger brother, Enrique picked Jesus up from school the day after the attack. He planned to find and talk to the individuals who had threatened Jesus. He intended only to demonstrate a show of support for his brother and, perhaps, engage in a fistfight with Jesus's attackers; he was not armed and did not intend to shoot anyone. While they were driving in Enrique's car, Jesus called Rangel; and they went to pick him up. Enrique did not know Rangel. As the three were driving, Rangel spotted Sandoval and declared, "There he is." Enrique made a couple of u-turns and planned to stop the car and confront the men. Suddenly, Rangel said, "I got this." He jumped out of the car and started shooting at Sandoval. Enrique was in shock. He explained he did not know Rangel had a gun. Later in the interview, however, he admitted he knew a couple of minutes before the shooting that Rangel had a gun. At trial his counsel argued an emotionally exhausted Enrique had merely agreed with his interrogators when he acknowledged knowing prior to the shooting Rangel had had a gun. In fact, his counsel argued, Enrique was telling the truth when he initially insisted in the interview he did not know Rangel had been armed.[4]

_____

[4]     During the interview Enrique denied several times knowing Rangel had a gun. Later, after Enrique admitted he knew a couple of minutes before the shooting that Rangel had been armed, the investigating officer asked, "[W]hat was it that he said that led you to believe he had a gun? 'Hey, if anything goes bad, I've got it. Don't worry

5

4. *The People's Gang Expert*

Hector Gutierrez, a 24-year-veteran of the Long Beach Police Department with substantial experience in gang crimes, testified as an expert witness for the People. Given a hypothetical resembling the facts of this case, Gutierrez opined the shooting was conducted in retaliation for the earlier attack on Jesus and committed to benefit the USV gang. He explained retaliation was necessary in gang culture to protect and enhance the gang's reputation and prevent future assaults.

Detective Gary Sloan of the Long Beach Police Department investigated Sandoval's murder. He testified he had not been able to find the shot-caller Rangel identified as "Big Man" or "Big Homie," a person Rangel described as a high-ranking member of USV. In addition, none of Sloan's gang contacts had heard of him. Sloan admitted that the expectation of the gang is that its members follow shot-caller's orders. He also acknowledged that Rangel had received a text on his cell phone five days before the shooting that read, "I don't know what you worked out with my cuz, but I want my money today. I'm not really someone you would want to fuck with. You just get me my money and we'll move on from this." Another message from the same number a few minutes later read, "I'll tell you what? If it's that funny to you, keep the money. It ain't shit to me, but you will remember me." Sloan stated that those texts were from an individual called Soo-Woo and had nothing to do with anyone named "Big Man" or "Big Homie." Sloan opined, based on his 24-years' experience in law enforcement relating to low level gangs and narcotics, that the text messages to Rangel from Soo-Woo involved "low-level drug dealing at best."

---

about it. I've got this?" Enrique replied, "Yes." The officer responded, "We don't want to put words in your mouth. . . . We want to know what he said. That almost sounds like you're just saying it because you think that's what we want to hear. . . . We want to know the truth from you. When did you know? It still doesn't make you a murderer." Enrique replied, "Couple of minutes before." Asked the words Rangel had used, Enrique stated, "[He] [t]old me, 'If anything goes bad dude, I got it.'"

5. *Jesus's Testimony*

Jesus testified in his own defense, and his testimony was admitted before both juries. Jesus claimed he was a member of the M2K tagging crew and an associate, not a member, of USV. According to Jesus, the day after he was assaulted, several ESP members drove by him after school brandishing what appeared to be a weapon. Jesus was frightened and called his older brother, Enrique, to pick him up from school. They drove together for a while attempting to find the men who had assaulted him the previous day, but were unsuccessful and soon abandoned that effort. On the way home Jesus saw Rangel on the street near Jesus's house; and he and Enrique agreed to give him a ride to his cousin's house in Progress Park, an area controlled by the ESP gang. While in the car with Jesus and Enrique, Rangel made a phone call and then told Enrique to drive to Downey Avenue. When Rangel saw Sandoval, he said, "Hold on. I know him. Stop." Enrique pulled over, and Rangel got out of the car. Suddenly Jesus heard several gunshots. Seconds later Rangel hopped back in the car just as Enrique swerved to avoid running over Sandoval, who was lying bleeding in the street. Jesus did not know Rangel had been armed with a gun. He denied any plans with Rangel to find ESP members and retaliate for the attack on him the previous day.

6. *The Prosecution's Theory and the Defendants' Theories*

The prosecution's theory was that Rangel, Jesus and Enrique planned the murder and were guilty of first degree premeditated murder either as direct perpetrators or as aiders and abettors. In addition to instructions on murder (CALCRIM No. 520) and first degree premeditated murder (CALCRIM No. 521), both juries were instructed on direct aiding and abetting principles (CALCRIM Nos. 400, 401). The prosecutor also argued Enrique had intended to commit an aggravated assault or a simple assault or a battery and murder was a natural and probable consequence of the target offense he intended to commit. His jury was instructed with a modified version of CALJIC No. 3.02 and specifically told that, if they found Enrique guilty under that theory, the crime was second degree murder.

Rangel's defense theory, which his counsel identified for the first time during closing argument, was that he had not been present at the shooting. Although he had confessed to the crime, his statement to police was the result of pressure he had felt from both Jesus and his interrogators to take the blame for something he did not do.

Enrique's and Jesus's defense theory was that Rangel had acted on his own in shooting Sandoval. Neither of them knew Rangel had had a gun. In addition, Enrique's counsel argued Enrique could not have reasonably foreseen Rangel's reckless and murderous actions and thus was not guilty under a theory that murder was the natural and probable consequence of the assault or battery offense he had intended to commit.

7. *The Verdicts and Sentences*

The jury found Rangel and Jesus guilty of first degree premeditated murder and found true the specially alleged firearm-use and gang enhancements. The court denied Jesus's and Rangel's motions for new trial and sentenced each of them to an aggregate state prison term of 50 years to life. Enrique's jury found him guilty of second degree murder and found true the specially alleged firearm-use and gang enhancements. He was sentenced to an aggregate state prison term of 40 years to life.

**DISCUSSION**

1. *The Trial Court Properly Permitted Rangel's Purported Alibi Witness To Invoke His Fifth Amendment Privilege Against Self-incrimination*

During trial Rangel attempted to call Art Renteria as an alibi witness. According to Rangel's counsel, Renteria told a defense investigator several months earlier that he had been with Rangel at another location at the time of the shooting. After giving that interview, Renteria was arrested and charged with an unrelated homicide. (Renteria had also been charged in connection with Sandoval's murder, but the charge was dismissed following a preliminary hearing.) Renteria, represented by his counsel, appeared at Rangel's trial outside the presence of the jury. Asked under oath about his prior interview with Rangel's investigator and what he knew about Rangel's whereabouts at the time of the shooting, Renteria invoked his Fifth Amendment privilege against self-incrimination on the advice of counsel. The court provided all counsel with an

8

opportunity to question Renteria further, and they declined. The court then held an in camera hearing with Renteria and his counsel to determine whether Renteria had a legitimate claim to self-incrimination and determined he did. Rangel did not object to the in camera proceeding.

Rangel contends, as he did in his motion for new trial, the court erred in permitting Renteria to invoke his Fifth Amendment privilege against self-incrimination without at least balancing Renteria's constitutional privilege against his own constitutional right to present a defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690-691 [106 S.Ct. 2142, 90 L.Ed.2d 636] ["[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation] or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'"].) He argues this failure constituted prejudicial error because, had such a balancing test been conducted, the balance would have tipped in favor of Rangel and Renteria would have been compelled to testify.

"It is a bedrock principle of American (and California) law, embedded in various state and federal constitutional and statutory provisions, that witnesses may not be compelled to incriminate themselves." (*People v. Seijas* (2005) 36 Cal.4th 291, 304; accord, *Hoffman v. United States* (1951) 341 U.S. 479, 486 [71 S.Ct. 814, 95 L.Ed. 1118].) "A witness may assert the privilege who has 'reasonable cause to apprehend danger from a direct answer.' [Citations.] However, 'the witness is not exonerated from answering merely because he declares that in doing so he would incriminate himself—his say-so does not of itself establish the hazard of incrimination.' [Citation.] The court may require the witness 'to answer if "it clearly appears to the court that he is mistaken."' [Citation.] 'To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' [Citation.] To deny an assertion of the privilege, 'the judge must be "'*perfectly clear*, from a careful consideration of all the circumstances in the

9

case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate."'" (*Seijas,* at p. 305; accord, *People v. Lucas* (1995) 12 Cal.4th 415, 454; *People v. Ford* (1988) 45 Cal.3d 431, 441-442; *Malloy v. Hogan* (1964) 378 U.S. 1, 12 [84 S.Ct. 1489, 12 L.Ed.2d 653].)

No authority supports Rangel's suggestion that Renteria's privilege against self-incrimination should have been balanced against Rangel's right to present a defense. To the contrary, the only permissible inquiry for the court when a witness asserts his or her Fifth Amendment privilege is whether the compelled testimony might tend to incriminate the witness. If so, the privilege is properly invoked; and no basis exists for the court or a party to invade it. Rangel does not contend Renteria's invocation of his Fifth Amendment rights in this case was improper. In any event, having conducted a particularized inquiry and determined Renteria's assertion of the privilege was justified because criminal charges were pending against him involving criminal street gang allegations, the court did not err in permitting Renteria to assert the privilege.

2. *Jesus Was Not Deprived of His Constitutional Right To Present a Defense*

Prior to trial Jesus and Enrique moved to sever their cases from Rangel's. Later, Jesus's counsel withdrew his motion to sever, explaining he wanted Rangel's full custodial statement to be introduced at his trial because he believed it would support his defense that Rangel had acted alone to satisfy a shot-caller's order not connected with Jesus. The prosecutor and the court expressed concern that introducing Rangel's statement at Jesus's trial when Rangel had asserted his right not to testify would violate Jesus's Sixth Amendment right to confront and cross-examine witnesses as articulated in *Crawford v. Washington* (2004) 541 U.S. 36, 68 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*), as well as the *Aranda/Bruton* rule.[5] In response, Jesus expressly agreed to

---

5    The *Aranda/Bruton* rule refers to *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476]. Both cases, which predate the Supreme Court's decision in *Crawford,* recognize that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant. In

10

waive any Sixth Amendment objection under *Crawford* or the *Aranda/Bruton* rule.

During trial outside the presence of the jury, the prosecutor submitted a transcript and tape recording of Rangel's statement and advised the court she had redacted the portion in which Rangel acknowledged he had witnessed, and to some extent participated in, other murders orchestrated or committed by the shot-caller known as "Big Man." The prosecutor explained she had anticipated that Rangel would object under Evidence Code section 352 that evidence of his participation in other crimes would be severely prejudicial. She also explained she had discussed her action, after-the-fact, with Rangel's counsel, and he had agreed to the redaction. Jesus objected, arguing his agreement to a joint trial was based on the admission of Rangel's full statement. Ruling the redacted portion of Rangel's statement was properly excluded as to Rangel under Evidence Code section 352, the court asked Jesus's counsel if Jesus wanted to retract his waiver of his Sixth Amendment confrontation rights. Jesus's counsel declined, stating he wanted Rangel's statement admitted in his trial even if partly redacted.

Jesus contends exclusion of portions of Rangel's statement "changed the rules mid-stream" and deprived him of a fair trial. The redacted material, he argues, enhanced the credibility of Rangel's explanation that he had felt threatened by a shot-caller and had acted independently from Jesus and Enrique when he shot Sandoval.[6]

We need not determine whether the court erred in excluding portions of Rangel's statement; for, even if the redacted material would have reinforced the credibility of Rangel's claim that he had felt threatened by a shot-caller, Rangel also stated that Jesus had provided the gun and was acting together with the shot-caller to ensure that Rangel carried out the shot-caller's order. Thus, from Jesus's perspective, the shot-caller-made-

this situation, the court must either grant separate trials, exclude the statement or excise all references to the nondeclarant defendant. (*Aranda,* at pp. 530-531; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1045.)

[6] Jesus does not claim admission of Rangel's redacted statement violated his Sixth Amendment rights. As discussed, he reaffirmed his waiver of his right to confront and cross-examine Rangel before the redacted statement was admitted.

11

me-do-it version of the murder, unaffected by the redacted portion of the statement, was no less incriminating than the prosecution's theory of the case. Whatever the prosecutor's motivation for her unilateral decision to redact part of Rangel's statement, on this record any error in excluding the limited portion of Rangel's statement was harmless as to Jesus under any standard of review. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal not required for state law error unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] [conviction must be reversed for federal constitutional error unless error was harmless beyond a reasonable doubt].)

### 3. *The Court Had No Sua Sponte Obligation To Instruct Enrique's Jury on Involuntary Manslaughter*

In a criminal trial the court must instruct the jury on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) This duty encompasses the obligation to instruct sua sponte not only on the crime with which the defendant is charged, but also on any lesser included offense that is supported by substantial evidence. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826; *People v. Breverman* (1998) 19 Cal.4th 142, 154; see *People v. Cruz* (2008) 44 Cal.4th 636, 664 [court has sua sponte duty to instruct on lesser included offense when there is substantial evidence that, if believed, would permit a reasonable juror to find the defendant committed the lesser, but not the greater, offense]; *Burney*, at p. 250 ["'[t]o justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury . . . could conclude that the facts underlying the particular instruction exist'"].)

Enrique was charged with murder, which the prosecutor sought to prove under two alternative theories of accomplice liability: Either Enrique acted as a co-principal and aided a planned murder or he intended to aid an assault (simple or aggravated) or battery and murder was the reasonably foreseeable result of that target crime. (See *People v.*

12

*Prettyman* (1996) 14 Cal.4th 248, 254 [under the natural and probable consequences doctrine, "a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted"]; accord, *People v. Chiu* (2014) 59 Cal.4th 155, 164-166.)  Under this natural and probable consequence theory, the aider and abettor's intent to commit the nontarget homicide is immaterial.  Liability is established if a reasonable person in the defendant's position should have known the nontarget offense (murder) was a reasonably foreseeable consequence of the act he or she aided and abetted.  (*Chiu,* at pp. 164-165; see *People v. Medina* (2009) 46 Cal.4th 913, 922 [shooting of victim, though not intended, was a "reasonably foreseeable consequence of the gang assault in this case"].)

Involuntary manslaughter is a lesser included offense of murder.  (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1145.)  It is defined by statute as the killing of a human being without malice "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b).)  An unintentional homicide committed in the course of a noninherently dangerous felony is also involuntary manslaughter (*People v. Burroughs* (1984) 35 Cal.3d 824, 835), as is a homicide committed without malice in the course of an inherently dangerous assaultive felony.  (Compare *People v. Hansen* (1994) 9 Cal.4th 300, 312 [killing during inherently dangerous assaultive felony committed without malice and not amounting to felony murder is some form of manslaughter], overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1199 with *People v. Bryant* (2013) 56 Cal.4th 959, 970 [homicide committed without malice during inherently dangerous assaultive felony cannot be voluntary manslaughter because that crime requires malice; that is, either an intent to kill or conscience disregard for human life]; see *People v. Brothers* (2015) 236 Cal.App.4th 24, 34 [if homicide committed during inherently dangerous assaultive felony without malice is manslaughter, and it is not voluntary manslaughter, then the

13

"necessary implication" of *Bryant* and *Hansen* is that the offense is involuntary manslaughter].).[7]

As Enrique suggests, a defendant charged with murder under the natural and probable consequences theory would be entitled to an instruction on involuntary manslaughter as a lesser included offense if there was substantial evidence from which a reasonable juror could find the defendant intended to aid and abet only a misdemeanor (simple assault or battery) or an assaultive felony and could not conclude that murder was the natural and probable consequence of the target offense—that is, the victim's death was an unintended and unforeseeable result of the crime the defendant actually assisted. Under those circumstances the defendant would have assisted in the commission of a homicide without express or implied malice and would be guilty as a co-principal of involuntary manslaughter as that crime is defined in section 192, subdivision (b), and in *People v. Burroughs, supra*, 35 Cal.3d 824 and *People v. Bryant, supra*, 56 Cal.4th 959. Contrary to Enrique's contention, however, he was not entitled to a sua sponte instruction on involuntary manslaughter in this case.[8]

Even if Enrique's jury believed his highly unlikely version of events—that he intended at most to aid and abet a simple assault or battery—the evidence was undisputed that Enrique, Jesus and Rangel were hunting for ESP gang members; Enrique knew Rangel had a gun; and he understood Rangel intended to use it and "take care of things" if the situation got out of hand. On this record there simply was no material issue whether murder was the natural and probable consequence of the target offense that Enrique intended to aid and abet. (See *People v. Cook* (2006) 39 Cal.4th 566, 597

---

[7] A homicide committed during an inherently dangerous felony not amounting to assault and therefore not subject to the *Ireland* merger doctrine (see *People v. Ireland* (1969) 70 Cal.2d 522) is either first or second degree felony murder, depending on whether the felony is one of those enumerated in section 189. (*People v. Chun, supra,* 45 Cal.2d at p. 1182.)

[8] We review independently whether instructions on the lesser included offense of involuntary manslaughter were required in the present case. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

14

[defendant not entitled to a sua sponte instruction on involuntary manslaughter in a prosecution for murder because the evidence did not raise a material issue whether the killing was committed with malice]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1593 ["the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise"]; see also *People v. Brothers, supra*, 236 Cal.App.4th at p. 35.)

>    4. *The Error in the Instruction on Natural and Probable Consequences Does Not Compel Reversal Because There Is No Reasonable Likelihood the Jury Misunderstood or Misapplied the Instruction*

The trial court instructed the jury with CALJIC No. 3.02 on the natural and probable consequence doctrine. Neither the parties nor the court noticed, however, that the instruction given, which had been modified to include the target crimes of battery, assault and assault with a deadly weapon, had inadvertently transposed those target crimes with the word murder, so that the instruction, given orally and in writing, improperly stated that in order to find Enrique guilty of murder under this theory, "you must be satisfied beyond a reasonable doubt that . . . [¶] . . . [¶] . . . [t]he crimes of [b]attery, or [a]ssault or [a]ssault with a [d]eadly [w]eapon were a natural and probable consequence of the commission of the crime of [m]urder" rather than correctly stating that it must find murder was the natural and probable consequence of the target crimes of battery, assault or assault with a deadly weapon. Significantly, however, the very next sentence clarified that to find Enrique guilty under this theory, it must find he "aided and abetted the commission of an identified and defined target crime [defined earlier in the instruction to include battery, assault and assault with a deadly weapon], and that the crime of [m]urder was a natural and probable consequence of the commission of that target crime."[9]

---

[9] The instruction as a whole read, "One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime[/]those crimes, but is

15

Enrique highlights the transposition error and claims it was prejudicial because it permitted the jury to find Enrique guilty of murder under a theory that he aided one target crime and murder was the natural and probable consequence of a different target crime. The cited error permitted no such thing. Read literally and in isolation, it permitted the jury to find Enrique guilty of assault, battery or aggravated assault if it found one of those crimes a natural and probable consequence of murder. Were that the end of the instruction, it not only would make no sense, but also would be wholly inconsistent with what the prosecutor and defense attorney had argued to the jury. In fact, any possible ambiguity was clarified in the next sentence in which the jury was told it could only find Enrique guilty of murder under this theory if it found murder was the foreseeable result, that is, the natural and probable consequence, of the target crime Enrique intended to aid and abet. This sentence both corrects the transposition error and fully negates Enrique's contention the instruction permitted the jury to find him guilty of murder without

---

also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted. [¶] In order to find the defendant guilty of the crime of Murder under this theory, as charged in Count 1, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime or crimes of Battery, or Assault, or Assault with a Deadly Weapon was committed; [¶] 2. That the defendant aided and abetted those crimes; [¶] 3. That a co-principal in that crime committed the crime of Murder; and [¶] 4. The crimes of Battery or Assault, or Assault with a Deadly Weapon were a natural and probable consequence of the commission of the crime of Murder. [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected [was] likely to occur. The issue is to be decided in light of all the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen. [¶] You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of Murder was a natural and probable consequence of the commission of that target crime. [¶] If you find the defendant guilty of Murder under this theory, it is murder in the 2nd Degree as a matter of law."

16

determining whether murder was a natural and probable consequence of the specific crime he had intended to aid and abet. In sum, considered in context and with the instruction as a whole, there is no reasonable likelihood the jury misunderstood and misapplied the instruction. (See *People v. Hughes* (2002) 27 Cal.4th 287, 341 [an instruction can only be found to be misleading if, in the context of the entire charge, there is a reasonable likelihood the jury misconstrued or misapplied its words]; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1237 [same]; see *People v. Carey* (2007) 41 Cal.4th 109, 130 ["""[j]urors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case"""].)

5. *Substantial Evidence Supports Enrique's Second Degree Murder Conviction and the Gang Enhancement*

Enrique contends his second degree murder conviction is not supported by substantial evidence.[10] However, as discussed, there was ample evidence that he aided and abetted an aggravated assault and murder was the natural and probable consequence of that target crime: By his own admission, Enrique intended to find an ESP gang member and, if talking did not settle the matter, to attack him; he also knew Rangel had a gun, creating the deadly situation that ultimately occurred. (*People v. Medina, supra,* 46 Cal.4th at p. 925.) Indeed, gang fights between rival criminal street gangs that escalate into brawls resulting in homicide are paradigmatic circumstances in which the

---

[10] "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) "The relevant facts must, however, meet the statutory requirements for a gang enhancement in order for it to apply." (*People v. Garcia* (2014) 224 Cal.App.4th 519, 523.)

17

Court has upheld natural and probable consequences liability. (See *ibid.*; *People v. Smith* (2014) 60 Cal.4th 603, 619-620 [substantial evidence supported jury's finding murders of rival gang members were natural and probable consequences of the target offenses of disturbing the peace and assault or battery; "a reasonable jury could find that the murders were a very foreseeable consequence of the jump out that the defendant had aided and abetted"]; see also *People v. Prettyman, supra,* 14 Cal.4th at pp. 262-263 [collecting cases].) As in those cases, there was substantial evidence in the instant matter to support the jury's second degree murder finding.[11]

Enrique's related contention that the evidence was insufficient to support the jury's true finding on the gang enhancement also fails. At the threshold, Enrique's argument there was insufficient evidence he was a gang member misses the mark. The applicability of the gang enhancement "does not depend on membership in a gang at all. Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 67-68.) In any event, there was substantial evidence, including Mejia's testimony offered without objection, that Enrique was a USV gang member. Moreover, apart from evidence of his USV membership, there was substantial evidence that Enrique had participated in this crime in concert with USV gang members—Rangel and Jesus—with the intent to benefit that gang. Detective Gutierrez opined, based on hypothetical facts identical to the instant matter, the shooting was conducted in retaliation for the earlier attack on Jesus and committed to benefit the USV gang. He explained retaliation was

_____

11    Enrique does not contend the court erred in instructing the jury on direct aiding and abetting principles. Rather, he argues there is insufficient evidence to support the jury's verdict under either theory. In light of our holding that the jury's second degree murder verdict is supported by substantial evidence that murder was the natural and probable consequence of the target crime Enrique intended to commit, we need not reach the alternative argument that there was insufficient evidence of direct aiding and abetting to support the jury's murder verdict. (*People v. Silva* (2001) 25 Cal.4th 345, 370 ["[i]f a count is submitted to a jury on alternative theories, and the evidence is insufficient as to one theory, we assume the jury rested its verdict on the theory adequately supported by the evidence"]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1127-1130.)

18

vital in gang culture to protect and enhance the gang's reputation and prevent future assaults.

Enrique argues on appeal, as he did to the jury, that his intent was to talk to the men who had attacked his brother and, at most, to get into a fist-fight. He insists he and his brother were members of the M2K tagging crew, not USV gang members; and his actions were personally motivated to protect his brother and were not intended to benefit the USV gang. The jury, however, was free to reject that explanation; and substantial evidence supports its finding that Enrique engaged in conduct with USV gang members to avenge and bolster the reputation of the USV criminal street gang.

6. *The Minute Orders and Abstracts of Judgment Must Be Modified To Accurately Reflect the Sentences Imposed*

At the defendants' joint sentencing hearing the court orally imposed a joint and several restitution award of $9,500 ($5,000 to the victim compensation board and $4,500 to Judi Magdaleno, Sandoval's mother). Neither the minute orders nor the abstracts of judgment, however, reflect the joint and several nature of the court's restitution orders. Accordingly, the judgments are modified to accurately reflect the terms of the court's sentencing orders. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [trial court's oral pronouncements are best indicator of intent and prevail over clerk's minute order]; *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate court may order abstract of judgment corrected in order to accurately reflect the oral judgment of sentencing court].)

## DISPOSITION

The judgments are modified to accurately reflect the joint and several nature of the court's restitution orders. As modified the judgments are affirmed. The superior court is directed to prepare corrected abstracts of judgment and forward them to the Department of Corrections and Rehabilitation.

PERLUSS, P. J.

We concur:

SEGAL, J.

BLUMENFELD, J. *

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.